# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-40998

UNITED STATES OF AMERICA,

United States Court of Appeals
Fifth Circuit

**FILED**

January 28, 2016

Lyle W. Cayce
Clerk

Plaintiff - Appellee

v.

ROBERTH WILLIAM VILLEGAS ROJAS, also known as Roberto Villegas; JAIME GONZALO CASTIBL CABALCANTE; OSCAR ORLANDO BARRERA PINEDA, also known as Oscar, also known as Capi; JULIO HERNANDO MOYA BUITRAGO, also known as Primito,

Defendants - Appellants

Appeals from the United States District Court
for the Eastern District of Texas

Before BENAVIDES, CLEMENT and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

This appeal concerns a Colombian conspiracy to import thousands of kilograms of cocaine into the United States. After a three-week trial, a jury found four defendants, appellants here, guilty of conspiring to knowingly or intentionally import five or more kilograms of cocaine into the United States in violation of 21 U.S.C. §§ 959 and 960, and all in violation of 21 U.S.C. § 963. The jury also found three of the four defendants guilty of aiding and abetting each other while distributing five or more kilograms of cocaine, intending and knowing that it would be unlawfully imported into the United States, in

No. 13-40998

violation of 21 U.S.C. § 959 and 18 U.S.C. § 2. The four defendants timely appealed, raising various challenges to their convictions and sentences. We affirm.

**I.**

In October 2009, a grand jury returned a two-count indictment charging twenty-seven defendants with participation in a vast Colombian conspiracy to import cocaine into the United States. Count One charged a conspiracy offense under 21 U.S.C. § 963, alleging: (1) the defendants conspired to knowingly and intentionally import five or more kilograms of cocaine into the United States, in violation of 21 U.S.C. §§ 952 and 960; and (2) the defendants conspired to knowingly and intentionally manufacture and distribute five or more kilograms of cocaine, intending and knowing that it would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959 and 960. Count Two alleged that the defendants aided and abetted each other while intentionally and knowingly manufacturing and distributing five or more kilograms of cocaine, intending and knowing that it would be unlawfully imported into the United States, in violation of 21 U.S.C. § 959 and 18 U.S.C. § 2.

Nineteen of the twenty-seven defendants pled guilty, two died before they could be extradited to the United States, and two fled and remain fugitives. The four remaining defendants—appellants here—went to trial: Jaime Gonzalo Castibl Cabalcante ("Cabalcante"), Oscar Orlando Barrera Piñeda ("Piñeda"), Julio Hernando Moya Buitrago ("Moya"), and Roberth William Villegas Rojas ("Rojas").

The trial focused primarily on two drug transactions. The first transaction was a thwarted attempt in December 2007 to move at least 1,000 kilograms of cocaine from Colombia to Guatemala and, from there, to the United States–Mexico border and then into the United States. This particular

2

plan involved a plane with tail number HP1607, and thus was often referred to by the parties as the HP1607 flight or the HP1607 deal. Cabalcante brokered the HP1607 deal by introducing the Colombian suppliers to the Mexican buyers, members of the Los Zetas drug cartel. The Zetas paid about $7.9 million for this deal—an amount that would have purchased several thousand kilograms of cocaine in 2007.

In Colombia, Carlos Eduardo Gaitan-Uribe ("Gaitan"), who was indicted in this conspiracy but died before trial, coordinated logistics by recruiting pilots, maintaining airplanes, securing clandestine airstrips, and contacting corrupt air traffic controllers. Defendant Moya, an air traffic controller who worked as a supervisor at the El Dorado International Airport in Bogota, agreed to help Gaitan get HP1607 through Colombian airspace. Defendant Piñeda was the pilot who flew HP1607 from Bogota to Panama for staging. Piñeda also coordinated the pilots who then flew the plane from Panama back into Colombia to pick up the cocaine.

HP1607's return trip to Colombia on December 20, 2007, did not go as planned. The Colombian Air Force detected the plane heading back to Colombia and sent a plane to follow HP1607 until it landed at a clandestine air strip. Because the Air Force failed to make contact with HP1607 before it landed, the Air Force dispatched a combat aircraft to the landing strip. After firing warning shots with no response, the Air Force fired at HP1607 and destroyed it. In a wiretapped call after the thwarted HP1607 flight, Piñeda commented that they "were left without Christmas" and could instead "get together and cry together" about the failed flight. The Zetas held Cabalcante responsible for the failed transaction, holding him hostage for three months.

Although he was not involved in the HP1607 transaction, Defendant Rojas was involved in other cocaine transactions. Rojas was connected to the conspiracy through a drug trafficker named German Giraldo Garcia (alias "El

No. 13-40998

Tio"), who was indicted in this case but remains a fugitive. El Tio worked with David Quinones ("Quinones"), Gaitan's logistics partner, to build an organization to import drugs into the United States. The main transaction concerning El Tio that the parties focused on at trial involved a deal he made in 2008 with a cocaine supplier named Jamed Colmenares (alias "El Turco"). Rojas was El Turco's right-hand man. The buyer for this $1.1 million deal was a Mexican man called "Chepa." This transaction also failed when, on October 22, 2008, the Colombian National Police intercepted a truck carrying about 1,000 kilograms of cocaine.

After Chepa held El Tio hostage for failing to deliver the cocaine, Chepa and El Tio agreed that El Tio would have to make up for the lost truck load. On November 26, 2008, El Tio had a meeting with Quinones, El Turco, and Rojas to plan their second attempt. Five days after the meeting, Rojas said over the phone that he had half the "luggage" at his house and was waiting for El Tio to tell him when to transport the load to an airplane so that it could be flown to Central America.

The Colombian National Police again thwarted this plan the very next day when the police seized 286 kilograms of cocaine found in a parked truck. Rojas paced the street in front of the parking lot while the police searched the truck. On a wiretapped call, Rojas told his boss, El Turco, that the cocaine had been seized again.

After a three-week trial, the jury found Cabalcante, Moya, and Rojas guilty of the § 963 conspiracy offense charged in Count One and all four defendants guilty of the § 959 distribution offense charged in Count Two. This appeal followed.

## II.

The defendants raise twenty issues on appeal.

4

No. 13-40998

## 1.  Validity and Extraterritoriality of 21 U.S.C. §§ 959 and 963

Cabalcante and Piñeda challenge the constitutionality of 21 U.S.C. §§ 959 and 963[1] and argue that these statutes do not substantively reach extraterritorial acts. In their briefs, Cabalcante and Piñeda characterize this argument as a challenge to the district court's subject-matter jurisdiction. They also contend that, because jurisdictional issues may be raised at any time, this court should review their "jurisdictional" issue de novo. *See United States v. Kaluza*, 780 F.3d 647, 653 (5th Cir. 2015). But the question "whether a statute applies extraterritorially is a question on the merits rather than a question of a tribunal's power to hear the case."[2] *Villanueva v. U.S. Dep't of Labor*, 743 F.3d 103, 107 n.4 (5th Cir. 2014) (citing *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010)); *accord United States v. Delgado–Garcia*, 374 F.3d 1337, 1341–42 (D.C. Cir. 2004) (explaining that the defendants' argument that the statute of conviction did not apply extraterritorially did not deprive the district court of subject-matter jurisdiction). So we do not automatically review de novo.

The defendants did not challenge the extraterritorial application or the constitutionality of these statutes in the district court.[3] Thus, we review for

---

[1] The indictment also alleged that the defendants conspired to violate 21 U.S.C. § 952, but the defendants do not challenge that provision on extraterritoriality grounds on appeal.

[2] The district court had subject-matter jurisdiction over this case. The indictment charged the defendants with committing federal crimes under Title 21 of the United States Code. Thus, the district court had subject-matter jurisdiction under 18 U.S.C. § 3231. *See Kaluza*, 780 F.3d 647, 655 n.20 ("In the criminal context, 18 U.S.C. § 3231 is all that is necessary to establish a court's power to hear a case involving a federal offense, whether or not the conduct charged proves beyond the scope of Congress' concern or authority in enacting the statute at issue."). Indeed, in their jurisdictional statements in their briefs, Cabalcante and Piñeda acknowledge that the district court had jurisdiction under § 3231.

[3] In their reply brief, Cabalcante and Piñeda assert that they did raise these challenges at the final pretrial hearing, by arguing that the government lacked any evidence to establish that the cocaine in this case "was intended for the United States in order for the United States to have jurisdiction over that because you have to show a specific violation of

5

No. 13-40998

plain error. *See United States v. Snarr*, 704 F.3d 368, 382 (5th Cir. 2013). On plain-error review, we will reverse only if "(1) there is an error, (2) that is clear or obvious, and (3) that affects [the defendant's] substantial rights." *United States v. Ferguson*, 211 F.3d 878, 886 (5th Cir. 2000). Even if these conditions are met, the decision whether to correct a forfeited error remains soundly within our discretion. *See United States v. Olano*, 507 U.S. 725, 735-36 (1993). We exercise that discretion only if an error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 736 (alteration in original).

*Constitutionality*

Cabalcante and Piñeda challenge the constitutionality of 21 U.S.C. §§ 959 and 963, arguing that Congress lacked power to enact them under either the Offences Clause or the Commerce Clause. Congress enacted both provisions as part of the Comprehensive Drug Abuse Prevention and Control Act of 1970, using its Commerce Clause power, not its Offences Clause power. *See* 21 U.S.C. § 801(3). The Act has been upheld several times as a valid exercise of Congress's commerce power. *See United States v. Perez–Herrera*, 610 F.2d 289, 292 (5th Cir. 1980) (holding in a case challenging § 963 that "[t]he legislative history of the Act indicates a real concern on the part of Congress that the illegal importation of narcotics has a 'substantial and direct' effect on interstate and foreign commerce"); *United States v. Martinez*, 481 F.2d 214, 221 (5th Cir. 1973) (holding that a constitutional attack on the Act was "without merit"); *accord United States v. Hernandez*, 480 F.2d 1044, 1046 (9th Cir. 1973) (characterizing the Act as "a cohesive statutory system rooted

the United States law, not just that we enforce our law anywhere." This argument was related to the sufficiency of the evidence; it was not a challenge to the constitutionality or extraterritorial application of 21 U.S.C. §§ 959 and 963.

6

in Congress' powers to regulate interstate and foreign commerce"); *cf. also United States v. Lawrence*, 727 F.3d 386, 396-97 (5th Cir. 2013) (upholding § 959(b) as a valid exercise of Congress's treaty-making power under the Necessary and Proper Clause and, in particular, its power to enforce the Single Convention on Narcotic Drugs, of which the United States was a party). Thus, Cabalcante and Piñeda's constitutional challenge fails.

### *Extraterritoriality*

We turn next to whether 21 U.S.C. §§ 959 and 963 reach extraterritorial acts. This question requires us to consider the presumption against extraterritorial application of United States law, whether extraterritorial application is consistent with international law, and the demands of constitutional due process.

Generally, there is a presumption against the extraterritorial application of United States law. *See Kiobel v. Royal Dutch Petrol. Co.*, 133 S. Ct. 1659, 1664 (2013). But that presumption is overcome when "a statute gives . . . clear indication of an extraterritorial application." *Id.* Here, 21 U.S.C. § 959, which concerns manufacture and distribution of cocaine with the intent to import, expressly states that the statute "is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States." 21 U.S.C. § 959(c); *see United States v. Villanueva*, 408 F.3d 193, 199 (5th Cir. 2005) ("Congress intended that the prohibition of attempts to import drugs should apply to attempts made wholly outside of our borders." (quoting *Perez–Herrera*, 610 F.2d at 291)). In contrast, 21 U.S.C. § 963, which concerns importation of cocaine, lacks explicit language indicating that Congress intended for it to apply extraterritorially. But we have addressed the same issue in a previous case and held that Congress did so intend. *See*

7

No. 13-40998

*Lawrence*, 727 F.3d at 395. Thus, the presumption against extraterritoriality is overcome for both statutes.

Extraterritorial application must also be consistent with international law. *See id.* at 394. "The law of nations permits the exercise of criminal jurisdiction by a nation under five general principles[:] . . . the territorial, national, protective, universality, and passive personality principles." *Id.* (citation omitted).[4] The government argues that the criminalization of the defendants' conduct is justified under the protective and territorial principles.

Under the protective principle, a country can "enforce criminal laws *wherever and by whomever* the act is performed that threatens the country's security or directly interferes with its governmental operations." *Id.* at 395. In *Lawrence*, we held that the protective principle justified the extraterritorial application of 21 U.S.C. § 959(b), which criminalizes the manufacture, distribution, or possession of a controlled substance by "any United States citizen on board any aircraft, or any person on board an aircraft owned by a United States citizen or registered in the United States," because "Congress has demonstrated . . . that it considers the international drug trade to be a major threat to the safety of the United States." *Id.* at 391, 395. *Lawrence* does not directly control this appeal, which concerns a different subsection of the statute—21 U.S.C. § 959(a), not § 959(b)—and which, unlike *Lawrence*, does not involve United States citizens. *See id.* at 388. Moreover, *Lawrence* emphasized that it did not address whether the protective principle would

---

[4] The term "jurisdiction" in this context is not the same as the district court's subject-matter jurisdiction under § 3231. In this international-law context, Congress's power to regulate or criminalize extraterritorial conduct is referred to as "jurisdiction to prescribe." *See Rivard v. United States*, 375 F.2d 882, 885 (5th Cir. 1967); *see also United States v. De La Garza*, 516 F.3d 1266, 1272 n.4 (11th Cir. 2008) (distinguishing the "jurisdiction to prescribe" from the district court's subject-matter jurisdiction).

apply when "absolutely no actions related to the crime were committed in the United States." *Id.* at 395.

Although *Lawrence* left open the issue that we face here, other courts have held that the protective principle justifies a prosecution under 21 U.S.C. § 959(a) even when the defendant's conduct occurred outside the United States. *See Chua Han Mow v. United States*, 730 F.2d 1308, 1311–12 (9th Cir. 1984) (applying the protective principle to the prosecution of a defendant whose conduct took place outside of the United States, but recognizing that the defendant's "co-conspirators committed acts in furtherance of the conspiracy inside the United States"). Moreover, the concern animating the application of the protective principle in *Lawrence*—minimizing the impact of the international drug trade on safety in the United States—is equally relevant when prosecuting conduct that was intended to have an impact on the United States. Thus, there are persuasive arguments that the protective principle supports the extraterritorial application of 21 U.S.C. § 959(a) under the circumstances that, as we find below, were proven here.

The government also argues that the territorial principle provides alternative support for applying 21 U.S.C. § 959(a) to the defendants' extraterritorial conduct. Our case law supports the proposition that intended effect in the United States is enough to satisfy the territorial principle for 21 U.S.C. §§ 959 and 963 prosecutions. *See United States v. Baker*, 609 F.2d 134, 139 (5th Cir. 1980) ("[S]o long as it is clear that the intended distribution would occur within the territorial United States . . . jurisdiction may be maintained[.]"); *United States v. Columba–Colella*, 604 F.2d 356, 358 (5th Cir. 1979) ("The [objective territorial] theory requires that before a state may attach criminal consequences to an extraterritorial act, the act must be intended to have an effect within the state."). Intent to impact the United States is built into 21 U.S.C. § 959(a), which criminalizes manufacturing or

distributing illegal drugs "intending [or] knowing" that the drugs "will be unlawfully imported into the United States." 21 U.S.C. § 959(a). As to § 963, we recognized in *United States v. Loalza–Vasquez*, 735 F.2d 153, 156 (5th Cir. 1984), that when a conspiracy statute does not have an overt-act requirement, "jurisdiction attaches [to extraterritorial acts] upon a mere showing of intended territorial effects." *See also United States v. Postal,* 589 F.2d 862, 886 n.39 (5th Cir. 1979) (stating in dicta that § 963 could possibly apply to a foreign conspiracy based on "mere proof of intended territorial effects" because § 963 does not require proof of an overt act); *Perez–Herrera,* 610 F.2d at 292 (recognizing that "even an attempt to violate the law injures the state" and that an attempt to bring illegal drugs into the United States "ha[s] real and significant effects within this country"). As already stated, 21 U.S.C. § 963 does not have an overt-act requirement. There are, therefore, persuasive arguments that the intended effect within the United States is sufficient to satisfy the territorial principle with respect to both statutory provisions. The district court did not plainly err in concluding that the extraterritorial application of 21 U.S.C. §§ 959 and 963 was consistent with international law.

In addition to consulting international law, we must also consider whether applying a statute extraterritorially violates due-process principles. "In the context of non-U.S. citizens, 'due process requires the government to demonstrate that there exists "a sufficient nexus between the conduct condemned and the United States" such that application of the statute would not be arbitrary or fundamentally unfair to the defendant.'" *Lawrence,* 727 F.3d at 396 (citation omitted). This nexus is demonstrated here because the defendants were charged with acting with the intent or knowledge that drugs would be unlawfully imported into the United States. *See United States v. Al Kassar,* 660 F.3d 108, 118 (2d Cir. 2011) ("[A] jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S.

citizens or interests."). Moreover, the defendants had fair warning that their conduct could be criminally prosecuted. "Fair warning does not require that the defendants understand that they could be subject to criminal prosecution *in the United States* so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." *Id.* at 119. As this court has recognized, "drug trafficking is condemned universally by law-abiding nations." *United States v. Suerte*, 291 F.3d 366, 371 (5th Cir. 2002). In sum, the district court did not plainly err by applying 21 U.S.C. §§ 959 and 963 extraterritorially.

### 2. Venue

Cabalcante, Rojas, and Moya argue that venue in the Eastern District of Texas was improper because their aircraft stopped for refueling in Guantanamo Bay, Cuba, before proceeding to Texas. We generally review "all questions concerning venue under the abuse of discretion standard." *United States v. Garza*, 593 F.3d 385, 388 (5th Cir. 2010). Here, however, the relevant facts for determining venue are not disputed. Consequently, this issue is a question of law—whether venue is proper in the Eastern District of Texas— that we review de novo.[5] *See Lawrence*, 727 F.3d at 391 ("This court reviews questions of statutory interpretation *de novo*.").

### *Venue for 21 U.S.C. § 959(a) Offenses*

If an offense is "not committed within any state, the trial shall be at such place or places as the Congress may by law have directed." U.S. Const. art. III, § 2. The venue provision governing 21 U.S.C. § 959(a), the manufacturing and distribution offense, provides, in relevant part: "Any person who violates this

---

[5] Below, Rojas and Moya moved to dismiss on the basis of improper venue and thus have preserved the issue. Cabalcante did not join the motion as to Count Two. Because we hold that venue was proper even under de novo review, we need not determine whether Cabalcante's challenge should be reviewed de novo or for plain error.

section shall be tried in the United States district court *at the point of entry where such person enters the United States*, or in the United States District Court for the District of Columbia." 21 U.S.C. § 959(c) (emphasis added). Here, the parties' dispute centers on the proper definition that should be given to the term "the United States." The undisputed facts show that all four defendants were arrested in Colombia and extradited to the United States. Cabalcante, Rojas, and Moya were flown from Bogota to the United States naval base at Guantanamo Bay, Cuba, where their planes refueled.[6] This stop lasted approximately thirty to forty-five minutes. They were then flown to McKinney, Texas, in the Eastern District of Texas.

The government contends that the defendants did not "enter[] the United States" until they reached McKinney and that venue was therefore proper in the Eastern District of Texas. In contrast, Cabalcante, Rojas, and Moya contend that they entered "the United States" when they reached Guantanamo Bay. They point out that Guantanamo Bay is not within any judicial district, and contend that, as a result, venue was proper only in the District of Columbia.

We find instructive the Eleventh Circuit's construction of the term "the United States" in *United States v. Ahumedo–Avendano*, 872 F.2d 367, 371–72 (11th Cir. 1989). In that case, the Eleventh Circuit interpreted the term "the United States" in the Maritime Drug Law Enforcement Act's venue provision, which was at the time identical to the venue provision we interpret here.[7] The Eleventh Circuit held that "the United States" meant "that geographic area encompassed within a judicial district[.]" *Id.* at 372. In support of its

---

[6] Piñeda's plane stopped in the Cayman Islands—he was never brought to Guantanamo Bay. As a result, Piñeda does not join this venue argument.

[7] When *Ahumedo–Avendano* was decided, the Maritime Drug Act's venue provision was codified at 46 U.S.C. § 1903(f). That provision is now codified at 46 U.S.C. § 70504(b).

interpretation, the court emphasized that the Maritime Drug Act's venue provision should be read alongside the venue provision in 18 U.S.C. § 3238, which concerns offenses not committed in any district, and which locates jurisdiction in the "district in which the offender . . . is first brought."[8] *Id.* The court observed that there is no judicial district at Guantanamo Bay, and concluded that, as a result, Guantanamo Bay is not part of "the United States" for purposes of determining proper venue. *Id.*; *see also United States v. Fuentes*, 877 F.2d 895, 900 (11th Cir. 1989) ("Because the United States Naval Base at Guantanamo Bay does not have a federal district court, it is not a district within the meaning of 46 U.S.C.[] § 1903(f)."). The Eleventh Circuit's reasoning in *Ahumedo–Avendano* is persuasive with respect to 21 U.S.C. § 959(c). That statute states that the trial "shall" be "*in the United States district court* at the point of entry where such person enters the United States." 21 U.S.C. § 959(c) (emphasis added). Like § 3238, § 959(c) links the "point of entry" to a judicial district. The first judicial district that the defendants entered was the Eastern District of Texas. Thus, we conclude that venue in the Eastern District of Texas was proper under § 959(c) for the § 959(a) offense.

Cabalcante, Rojas, and Moya argue that *Rasul v. Bush*, 542 U.S. 466 (2004), requires a different result. In *Rasul*, the Supreme Court held that the United States "exercises exclusive jurisdiction and control" over Guantanamo Bay. *Id.* at 476. Thus, defendants argue, Guantanamo Bay should be considered part of "the United States." But *Rasul* did not concern venue, but whether United States courts have jurisdiction under 28 U.S.C. § 2241 to

---

[8] Congress appears to have endorsed this interpretation by later amending the Maritime Drug Act's venue provision to mimic § 3238. *See* 46 U.S.C. § 70504(b). It now states that "[a] person violating . . . this title shall be tried in the district court of the United States for—(1) the district at which the person enters the United States; or (2) the District of Columbia."

No. 13-40998

consider habeas petitions filed by military detainees challenging their detention at Guantanamo Bay. *Id.* at 470–73. The defendants in this case were not held at Guantanamo Bay any longer than the thirty to forty-five minutes it took to refuel, and they did not file habeas petitions while they were there. We conclude that the Court's jurisdictional analysis in *Rasul* does not extend to the venue question presented here.

*Venue for 21 U.S.C. § 963 Offenses*

Cabalcante, Rojas, and Moya also challenge venue for the 21 U.S.C. § 963 conspiracy offense. Unlike § 959, § 963 does not have a built-in venue provision. The government proposes two possible venue provisions that might apply to this conspiracy offense: 21 U.S.C. § 959(c)—the venue provision for the underlying substantive offense—or 18 U.S.C. § 3238—the general venue statute for "[o]ffenses not committed in any district." We have applied each of these two venue provisions to § 963 offenses. *Compare United States v. Zabaneh*, 837 F.2d 1249, 1252, 1255–56 (5th Cir. 1988) (treating § 959(c)'s venue provision as applicable when a defendant is charged with conspiring in violation of § 963 to violate §§ 959 and 952(a)), *with United States v. Mansfield*, 156 F.3d 182, 1998 WL 546469, at *1 (5th Cir. 1998) (per curiam) (applying § 3238 to a § 963 conspiracy offense).

We need not resolve which provision applies here, however, because venue was proper in the Eastern District of Texas under either provision. As shown above, under 21 U.S.C. § 959(c), venue was proper in the Eastern District of Texas. Likewise, under 18 U.S.C. § 3238, the Eastern District of Texas was "the *district* in which the offender[s] . . . [were] first brought," because there is no judicial district at Guantanamo Bay. 18 U.S.C § 3238 (emphasis added); *see Harlow v. United States*, 301 F.2d 361, 370 (5th Cir. 1962) (holding that "territory governed by the United States is not a 'district' under Section 3238 unless the court having jurisdiction over that territory is

14

invested with the same power as ordinary district courts to try offenses made such by law of Congress"); *see also United States v. Lee*, 472 F.3d 638, 644–45 (9th Cir. 2006) (holding that American Samoa is not a "district" for purposes of § 3238 and explaining that "the term 'district' . . . mean[s] 'judicial district,' not a geographical region"). Thus, under either provision, venue was proper in the Eastern District of Texas for the conspiracy offense as well.

In response, Cabalcante, Rojas, and Moya argue that venue was improper in the Eastern District of Texas with respect to the conspiracy offense because no overt act occurred there. But § 963 does not have an overt-act requirement. *See Lawrence*, 727 F.3d at 397. This argument fails.

### 3. Venue Instructions

The defendants next argue that the district court erred by declining to give two proposed jury instructions on venue. The district court declined to give the instructions because there were no disputed issues of fact. We review a district court's refusal to give a requested jury instruction for abuse of discretion. *United States v. Zamora*, 661 F.3d 200, 208 (5th Cir. 2011).

The district court did not err in declining to give the defendants' requested instructions for two reasons. First, the venue issue that the defendants raised was a question of law, not a question of fact. "[F]ailure to instruct on venue is reversible error when trial testimony puts venue in issue and the defendant requests the instruction[.]" *Id.* "Venue is not put 'in issue' when the government presents adequate evidence of venue, and the defendant fails to contradict the government's evidence." *Id.* Here, there were no factual issues. As shown above, the government presented evidence that Cabalcante, Rojas, and Moya were transported from Colombia to Guantanamo Bay and then to Texas. The defendants did not dispute this evidence. Instead, the issue they raised was a question of statutory interpretation, which was for the district court to resolve. *See United States v. Bascope–Zurita*, 68 F.3d 1057,

1062–63 (8th Cir. 1995) (holding that any error in the district court's refusing to give a venue instruction to the jury was harmless when the facts were undisputed that the defendants were immediately brought to the Western District of Missouri after their arrest in Germany). The district court therefore did not abuse its discretion in refusing to instruct the jury on venue.

Second, the instructions that the defendants proposed misstated the law on venue. Both proposed instructions required the jury to find the defendants not guilty if the jury found that none of the defendant's conduct occurred in the Eastern District of Texas. Neither venue statute—21 U.S.C. § 959(c) or 18 U.S.C. § 3238—requires conduct to occur in the trial district; both statutes recognize venue for crimes that occurred extraterritorially. Further, these proposed instructions were incorrect because the § 963 conspiracy offense does not have an overt-act requirement. *See Lawrence*, 727 F.3d at 397. Therefore, both crimes could have been committed with no single act occurring in the trial district. *See also Baker*, 609 F.2d at 137 (recognizing that § 959 "explicitly cover[s] acts occurring wholly outside the territorial United States"). For this additional reason, the district court did not err in refusing to give the jury the defendants' proposed venue instructions.

### 4. **Motion to Suppress Wiretaps on Fourth Amendment Grounds**

Cabalcante, Piñeda, and Moya next argue that the district court erred by denying their motion to suppress all wiretap conversations recorded in Colombia. They contend, as they did below, that the wiretaps were recorded in violation of the Fourth Amendment as part of a "joint venture" between the Colombian National Police and the DEA. "Ordinarily, the fourth amendment does not apply to arrests and searches made by foreign authorities in their own country and in enforcement of foreign law." *United States v. Heller*, 625 F.2d 594, 599 (5th Cir. 1980). Our case law has identified two exceptions to this rule: "first, if the conduct of the foreign authorities in conducting the search 'shocks

the conscience' of the American court; and second, if American officials participated in the foreign search, or if the foreign authorities were acting as agents for their American counterparts." *United States v. Hawkins*, 661 F.2d 436, 456 (5th Cir. Unit B Nov. 1981). The defendants argue that the second exception—the "joint venture" exception—applies.

The district court denied defendants' motion to suppress, and their later motion to reconsider, holding that the Fourth Amendment did not apply to the wiretaps because the DEA did not participate in the wiretaps and because the Colombian National Police were not acting as agents of the DEA. After the jury returned a guilty verdict for all four defendants, Cabalcante, Piñeda, and Moya filed motions for a new trial that reasserted their arguments for suppression. The district court again denied these motions. In addition to reaffirming that the evidence did not support that there was a joint venture between the Colombian National Police and the DEA, the district court also held, for the first time, that because the defendants were foreign nationals living abroad, they were not entitled to protection under the Fourth Amendment based on the Supreme Court's decision in *United States v. Verdugo–Urquidez*, 494 U.S. 259 (1990).

Under *Verdugo–Urquidez*, the Fourth Amendment does not apply to searches and seizures of nonresident aliens who have "no previous significant voluntary connection with the United States." 494 U.S. at 271; *see also Hernandez v. United States*, 785 F.3d 117, 124 (5th Cir. 2015) (en banc) (Jones, J., concurring) ("This en banc court recognizes that the Supreme Court has foreclosed extraterritorial application of the Fourth Amendment to aliens where the violation occurs on foreign soil and the alien plaintiff lacks any prior

substantial connection to the United States." (citing *Verdugo–Urquidez*, 494 U.S. at 261)).

Here, at the time of the intercepts, the defendants were citizens and residents of Colombia. They do not argue that they had any significant voluntary connection to the United States. Nor does their participation in a drug trafficking conspiracy to import drugs into the United States constitute a sufficient connection to trigger the protections of the Fourth Amendment. In *Verdugo–Urquidez*, for example, the Court held that the defendant did not have a significant voluntary connection to the United States even though the DEA believed he was a leader of a drug trafficking organization that was smuggling narcotics into the United States and was detained in the United States pending trial when the DEA conducted the search. 494 U.S. at 262, 271, 274–75. Thus, under *Verdugo–Urquidez*, the defendants were not entitled to the protections of the Fourth Amendment. *See United States v. Emmanuel*, 565 F.3d 1324, 1331 (11th Cir. 2009) ("[The defendant's] participation in a drug trafficking conspiracy directed at importing drugs into the United States does not mean that he was part of the 'national community' protected by the Fourth Amendment.").

Cabalcante, Piñeda, and Moya respond that *Verdugo–Urquidez* does not apply because the Supreme Court did not address the joint-venture doctrine. But in *Verdugo–Urquidez*, the Supreme Court had no need to consider the joint-venture exception to the Fourth Amendment because the DEA itself performed the search. *See* 494 U.S. at 261–62; *see also Emmanuel*, 565 F.3d at 1331 ("Because the Fourth Amendment does not apply to nonresident aliens whose property is searched in a foreign country, there is no need to decide whether the Bahamian officials acted as agents of the United States or whether the wiretap was a joint venture."). The defendants also cite two post-*Verdugo–Urquidez* decisions from the Second Circuit that they believe

demonstrate that the court must still analyze the joint-venture doctrine regardless of where the search occurred. *See United States v. Getto*, 729 F.3d 221 (2d Cir. 2013); *United States v. Lee*, 723 F.3d 134 (2d Cir. 2013). But these cases dealt with searches of United States citizens; therefore, *Verdugo–Urquidez*'s limit on the Fourth Amendment did not apply. *See Getto*, 729 F.3d at 224; *Lee*, 723 F.3d at 136. The defendants in this case are not United States citizens, so the Second Circuit cases are not instructive.

Nor is it relevant that the defendants are invoking Fourth Amendment protections in the United States with respect to their prosecution here. The Supreme Court has explained that "a violation of the [Fourth] Amendment is 'fully accomplished' at the time of an unreasonable governmental intrusion." *Vergudo–Urquidez*, 494 U.S. at 264. "Whether evidence obtained from [a search on foreign soil] should be excluded at trial in the United States is a remedial question separate from the existence *vel non* of the constitutional violation." *Id.* Thus, we conclude that Cabalcante, Piñeda, and Moya have not shown that their constitutional rights were violated by admission of the Colombian wiretap evidence. Therefore, the district court properly denied the motion to suppress, the motion to reconsider, and the motion for a new trial.

## 5. Motion for New Trial on the Basis of Prosecutorial Misconduct

Cabalcante, Piñeda, and Moya next argue that the district court erred by denying their motions for a new trial on the basis of "newly discovered evidence" that they contend demonstrated prosecutorial misconduct. In February 2014, over a year after their trial, Cabalcante, Piñeda, and Moya filed motions for a new trial, arguing that testimony from a 2013 drug-conspiracy case in the Southern District of Florida conflicted with the testimony given by two law enforcement officers—Officer Milton Pacheco of the Colombian National Police and DEA Special Agent Michael Furgason—at the 2012 suppression hearing in this case. They contended that the earlier testimony

amounted to perjury and prosecutorial misconduct. The district court denied the motions, explaining that it saw no contradictions in the testimony from the two cases.

This was not error because any alleged contradictions are immaterial. *See United States v. Simpson*, 741 F.3d 539, 554 (5th Cir. 2014) ("To . . . warrant a new trial based on newly discovered evidence . . . , [the defendant] must show that the new . . . evidence is material."). As shown above, the defendants are not entitled to Fourth Amendment protections under *Verdugo–Urquidez*. The alleged new evidence from the Florida case relates only to the joint-venture issue, which is irrelevant in this case. That means that the district court did not abuse its discretion when it denied the new-trial motions.

## 6. Denial of Jury Instruction on Specific Intent

All four defendants argue that the district court erred when it refused to give their requested jury instruction on specific intent. "This Court reviews jury instructions 'for abuse of discretion, affording substantial latitude to the district court in describing the law to the jury.'" *United States v. Cessa*, 785 F.3d 165, 185 (5th Cir. 2015). The defendants wanted the district court to instruct the jury that, to convict a defendant, it would have to find that he "knew and specifically intended that the cocaine alleged in the Indictment was destined for the United States." The district court declined to give their proposed instruction. Instead, the district court instructed the jury that it could return a guilty verdict if it found that a defendant "either intended that the cocaine be unlawfully brought into the United States or knew that the cocaine would be unlawfully brought into the United States."

Section 959(a) criminalizes manufacturing or distributing a controlled substance "intending . . . *or* . . . *knowing* that such substance . . . will be unlawfully imported into the United States[.]" 21 U.S.C. § 959(a) (emphasis added). The government emphasizes that this provision "do[es] not require

intent *and* knowledge." Moreover, even though the indictment charged the defendants with "intending and knowing" that the cocaine would be imported, "a disjunctive statute may be pleaded conjunctively and proved disjunctively." *United States v. Pena–Rodriguez*, 110 F.3d 1120, 1131 (5th Cir. 1997). Hence the district court did not abuse its discretion by refusing to instruct the jury on specific intent.

### 7. Sufficiency of the Evidence

All four defendants challenge the sufficiency of the evidence to support their convictions. Our review of the government's proof is limited: We "view the evidence and the inferences drawn therefrom in the light most favorable to the verdict" and must accept the jury's guilty verdicts if any "rational jury could have found the defendant[s] guilty beyond a reasonable doubt." *Cessa*, 785 F.3d at 174.

*Elements of the Offenses*

Under 21 U.S.C. § 963 (Count One), the government had to prove "(1) that an agreement existed between two or more persons to violate the applicable narcotics law (*i.e.*, a conspiracy existed), (2) that each alleged conspirator knew of the conspiracy and intended to join it and (3) that each alleged conspirator participated (*i.e.*, joined) voluntarily in the conspiracy." *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998). The government had to show that each defendant intended or knew that the "conspiracy to import was directed at the United States." *United States v. Conroy*, 589 F.2d 1258, 1270 (5th Cir. 1979). Under 21 U.S.C. § 959(a) (Count Two), the government had to prove either that the defendants individually manufactured or distributed five or more kilograms of cocaine, intending or knowing that it would be unlawfully imported into the United States, or that the defendants associated with and purposefully participated in this criminal venture and

21

No. 13-40998

tried to make the venture successful. *See* 18 U.S.C. § 2 (aiding-and-abetting statute).

*Sufficiency of Evidence as to Mens Rea*

Three of the defendants—Cabalcante, Piñeda, and Rojas—challenge the sufficiency of trial evidence proving that they committed the Count One conspiracy offense and the Count Two distribution offense with the necessary intent or knowledge that the cocaine would be unlawfully imported into the United States.[9] To establish the mens rea element of either offense, the government needed to prove that the defendants either intended or knew that the drugs would be unlawfully imported into the United States. *See* 21 U.S.C. § 959(a); *Conroy*, 589 F.2d at 1270. The government could prove the defendants' intent or knowledge by "circumstantial evidence alone." *Medina*, 161 F.3d at 872; *see United States v. Conlan*, 786 F.3d 380, 385 (5th Cir. 2015).

Cabalcante and Piñeda argue that the government's evidence showed "no intent to import or distribute cocaine outside of Latin America," and Rojas suggests that the end point for the cocaine could have been Guatamala or Mexico. They point out on appeal, as they argued strenuously to the jury, that the cocaine in this case was destroyed or confiscated while still in South America and thus never actually reached the United States.

The government's experts testified to multiple factors indicating that the United States was the destination for cocaine in this conspiracy. Both William David Scott, a lieutenant with the Denton County Sheriff's Department's drug enforcement unit, and Special Agent Furgason testified that the large amount of American currency involved in this conspiracy—the HP1607 deal, for example, involved nearly $8 million—was an indication that the cocaine was

---

[9] Piñeda was not tried on the Count One conspiracy offense; he challenges the sufficiency of the evidence of his intent or knowledge to import for only the distribution offense in Count Two.

intended for the United States. *See United States v. Romero–Padilla*, 583 F.3d 126, 129–30 (2d Cir. 2009)). Furgason also testified that, based on his experience working for the DEA in Colombia, the mode of transportation used in this case—aircraft that did not have the range to fly to Europe—was another factor that the cocaine was destined for the United States. Furgason also testified that the route these planes took, from Colombia through Central America and then to Mexico, was a common route for planes to take if they were headed to the United States. As Furgason explained: "The routes . . . being initiated from within Bogota or Panama, headed toward Central America, Honduras, Guatemala. They don't—they wouldn't utilize the Mexicans if they didn't need them to transport the cocaine into the United States." *See United States v. Mejia*, 448 F.3d 436, 451 (D.C. Cir. 2006) (rejecting an insufficiency argument in part because of expert testimony that cocaine was seized on a principal land route for cocaine from Panama to the United States); *United States v. Freeman*, 660 F.2d 1030, 1034-35 (5th Cir. Unit B Nov. 1981) (rejecting same in part because there was expert testimony that the route of a drug-carrying boat positioned it to travel to the United States).

More broadly, but relevant to the jury's assessment of this rigorously disputed scienter and circumstantial evidence point, Furgason testified that "the overwhelming majority of the cocaine transported into Mexico is subsequently transported to the United States." *See United States v. Martinez*, 476 F.3d 961, 969 (D.C. Cir. 2007) (citing as evidence in support of the jury's verdict a DEA agent's testimony that almost every drug operation that transports Colombian cocaine through Central America intends to import the cocaine into the United States). In addition, the government introduced, among other evidence, expert testimony about the economic incentive to import cocaine into the United States as opposed to selling it in Mexico or elsewhere in South or Central America. For example, Lieutenant Scott testified that the

same gram of cocaine that would sell in Colombia for two dollars would sell in the United States for one hundred dollars. Thus, a reasonable jury could have rejected the defendants' suggestions and inferred that the defendants intended or knew that the United States was the end destination for the cocaine and not somewhere in Latin America. *See United Martinez*, 476 F.3d at 969 (rejecting an insufficiency argument in part because there was evidence that the sales price of cocaine increased dramatically if the drug was sold in the United States); *Freeman*, 660 F.2d at 1034 (rejecting same in part because there was evidence of the economic incentive of exporting marijuana from Colombia to the United States rather than to Mexico).

In addition to this expert testimony, several coconspirators testified that they knew that the cocaine involved in this conspiracy was being routed through Mexico to the United States. One coconspirator, for example, recounted that, on a trip to Mexico to make arrangements for the HP1607 transaction with the Zetas, he saw workers loading a van with cocaine for a shipment to McAllen, Texas. Although there is no evidence that the cocaine he saw was part of this conspiracy, the jury could reasonably infer, based on this episode, that the Zetas import cocaine into the United States. In turn, the Zetas had paid for the cocaine connected to the HP1607 flight, and Zetas members testified at trial that their "number-one goal" is to control the United States–Mexico border close to Brownsville, McAllen, Laredo, and Del Rio, Texas, so that they can "have a clear path to introduce [drugs] into the United States." Another coconspirator testified that "all of us who transport drugs know that the final destination of the drugs that get to Mexico and Central America comes to the United States. . . . All drug traffickers know that." *See Martinez*, 476

F.3d at 969 (citing coconspirators' knowledge that cocaine was headed to the United States as evidence that the defendant knew of the destination).

The government also introduced circumstantial evidence of intent or knowledge specific to each defendant. Cabalcante confessed to participating in the conspiracy. After his arrest, he told the DEA that he had referred his Colombian counterparts to the Zetas for the HP1607 deal. He informed the DEA that the deal was worth $7.9 million. Cabalcante also admitted that when the deal fell through, the Zetas held him responsible. To smooth over the failed deal, he went to Matamoros, Mexico—on the Mexican side of the United States–Mexico border near Brownsville, Texas—to meet with the Zetas. This evidence showed that Cabalcante was aware that the cocaine was headed to the Zetas at the United States–Mexico border and that the multi-million dollar deal was paid for in American dollars. Combined with the evidence that his coconspirators knew that drugs heading to Mexico almost always ended up in the United States, the evidence from Cabalcante's own confession supports the jury's verdict.

As to Piñeda, there was evidence that Piñeda flew HP1607 to Panama to be staged and that he then coordinated the arrangements of the pilots that flew the plane from Panama back to Colombia. There was expert testimony that the routes Piñeda discussed with another organizer—"From Panama to Colombia, and Colombia to Central America"—were consistent with an organization attempting to import cocaine into the United States. After HP1607 was destroyed, Piñeda reported over the phone that they would be "left without Christmas." He also mentioned that he was "a little concerned" that he had left documents inside the plane that could possibly identify him and others. Finally, a codefendant pilot who knew Piñeda and who also flew for Gaitan

testified that Piñeda worked for Gaitan, that Gaitan and Piñeda "were always together," and that he had seen Piñeda fly cocaine.

As to Rojas, the government presented evidence that Rojas was involved in two attempted transactions in 2008 that were brokered by El Tio, who recruited pilots and found airstrips and airplanes to further his business of "building an organization to import drugs into the United States," and El Turco, who supplied the cocaine. Rojas worked for El Turco. There was evidence that Rojas attended a meeting in November 2008 to plan the second attempt. Shortly after this meeting, Rojas explained in a recorded phone call that he had half of the cocaine for this deal at his home. The call makes clear that Rojas knew that the cocaine was headed to an airport, so it was reasonable for the jury to infer that Rojas knew that the cocaine would be shipped out of the country. When the Colombian National Police intercepted the cocaine in this second attempt, Rojas was nearby watching and reporting over the phone to El Turco everything that happened. An indicted coconspirator who worked for El Tio testified that the customer for these cocaine transactions was a Mexican man known as "Chepa" who would receive the cocaine in Mexico. Between this evidence and the expert and coconspirator testimony that drugs transported from Colombia to Mexico almost always end up in the United States, a reasonable jury could have inferred that Rojas knew or intended that the cocaine in these two transactions was bound for the United States.

In sum, when we view all the evidence in the light most favorable to the government and draw all reasonable inferences in its favor, we conclude that a rational jury could have inferred, on the basis of the evidence presented at trial, that Cabalcante, Piñeda, and Rojas intended or knew that the cocaine in this conspiracy was bound for the United States. Cabalcante, Piñeda, and

No. 13-40998

Rojas have not met their burden of demonstrating that the evidence presented at trial was insufficient to support their convictions.

*Sufficiency of Evidence as to Moya's Participation in the Conspiracy*

The fourth defendant, Moya, challenges the sufficiency of trial evidence proving his involvement with illegal drug trafficking. At trial, the government adduced the following evidence with respect to Moya's involvement in the drug trafficking scheme. Moya often used coded medical language when speaking to Gaitan to avoid being identified by law enforcement. For example, even though Moya was an air traffic controller, Gaitan would refer to Moya as "my little doctor." They used other medical terminology such as "hospital" and "trauma center" to refer to the airport and "surgery" and "waiting for some lab results" to refer to plane repair. The Colombian National Police also intercepted calls between Gaitan and Moya in which they discussed the Colombian Air Force's surveillance activities. In a call between Quinones and Gaitan, Quinones asked about Gaitan's "cousin" (his nickname for Moya) and whether he could "cooperate with [Quinones] at the hospital." Gaitan confirmed that Moya could help by explaining that "he [was] on shift at the trauma unit." All this evidence, taken together, tended to support the inference that Moya was involved in illegal drug trafficking. *See Mejia*, 448 F.3d at 451 (citing as evidence supporting the jury's verdict recorded conversations in which the defendants discussed drug transactions in code); *United States v. Rodriguez*, 666 F.3d 944, 947 (5th Cir. 2012) (citing as evidence supporting guilty verdict that the defendant "was sufficiently familiar" with the local leader of a drug trafficking organization that the leader "referred to him by the nickname 'Primo'").

There was also evidence of two specific drug flights that Moya was involved with as an air traffic controller. In connection with the first of those flights, on November 18, 2007, Moya and Gaitan spoke on the phone twenty-seven times. These calls, as interpreted by a former corrupt air-traffic

controller, revealed that Moya helped Gaitan guide a flight from Panama to Colombia and then from Colombia to Honduras. For example, Moya warned Gaitan that the plane was getting close to where the Panamanian radar could detect the plane and advised Gaitan that the plane should turn to the right, "not . . . more than 100 degrees." When the radar detected the plane anyway, Moya told Gaitan that "they already saw him." After the Air Force sent up a chaser plane, Moya told Gaitan to direct the flight north from nearby San Andrés island to avoid the chaser. Having avoided the Air Force, the flight finally reached its destination. The next day, Gaitan called Moya and told him, "cousin . . . later I'm going to be over here again, so -- so I can start giving you what is yours"—that is, so that Gaitan could pay Moya for the information that Moya had provided to assist with the flight.

As to the second—the HP1607 flight on December 20, 2007—the jury heard several calls between Moya and Gaitan in the days leading up to the flight. In one, Moya assured Gaitan that they could "count on" a man named Carreno, who was believed to be an air traffic controller in the Colombian Air Force, to help them with paperwork for HP1607. Furgason testified that these calls occurred around the same time that Gaitan was preparing HP1607 to fly from Panama to Colombia to be loaded with cocaine. All of this evidence, taken in the light most favorable to the verdict, was sufficient to support the inference that Moya was involved in the conspiracy to traffic illegal narcotics.

In response, Moya argues that it would have been impossible for him to assist with the flights in the manner alleged by the government for two logistical reasons. First, he contends that he did not have access to air force radar. This argument ignores evidence introduced at trial that the military shares its radar information with civilian air traffic controllers and that Moya himself had contact with officials in the Colombian Air Force. Second, Moya contends that "security features" at the El Dorado Airport in Bogota would

have made it "impossible" to communicate with illegal flights. Moya refers to testimony about surveillance cameras and a cellphone-signal blocker that were installed where Moya worked. The government points out, however, that security cameras did not make it impossible to coordinate drug flights because there was no evidence that the cameras recorded audio. As to the cell-signal blocker, a different air traffic controller testified that employees could make calls by stepping into the lounge or the bathroom. So these argument are unpersuasive.

Moya also argues that his conviction should be overturned on the ground that DEA Agent Furgason testified falsely before the grand jury.[10] Moya did not raise this argument in his new-trial motion, so we review for plain error. *See Snarr,* 704 F.3d at 382. Moya asserts that Furgason's grand jury testimony "that there was a drug flight on November 19, 2007 and it was going to Honduras and Mr. Moya had talked to pilots via a satellite telephone was pure fiction and Agent [Furgason] admitted as much at trial." On this record, Moya's challenge to Furgason's grand jury testimony about the November 18[11] flight cannot be sustained. Before the grand jury, Furgason described several recorded conversations that Moya had with Gaitan on November 18, 2007. At trial, the jury actually heard these recorded phone calls—all twenty-seven of them—and an indicted coconspirator interpreted them. As shown above, the contents of the November 18 calls were consistent with Furgason's grand jury testimony that Moya instructed Gaitan to have the pilots "turn around and

---

[10] Moya also argues that "[i]t is clear that the information provided for extradition . . . was fiction and half facts." Moya does not elaborate on this argument in the argument section of his brief. He has waived the argument by failing to adequately brief it. *See United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010).

[11] Furgason said November 19, not 18, but Moya allows that this was an "acceptable mistake."

complete a circle" and that "the clandestine aircraft was able to continue on to Honduras."

We turn next to Moya's contention that Furgason's testimony about Moya's use of a satellite telephone was "pure fiction." Before the grand jury, Furgason did testify that Moya used a satellite telephone. At trial, there was testimony that corrupt air traffic controllers generally did not communicate directly with pilots and would instead communicate with a coordinator (here, Gaitan). Although Furgason's grand jury testimony may have been inexact, it does not rise to the level of false testimony. It therefore was not plain error for the district court to not declare a mistrial based on a finding that Furgason's grand jury testimony was false.

## 8. Admission of Evidence from *Avante* Cocaine Seizure

Cabalcante argues that the district court erred by admitting evidence of cocaine seized after the indictment period from the boat *Avante* on the ground that the evidence was extrinsic to the conspiracy charged and inadmissible under Federal Rule of Evidence 404(b). The indictment in this case alleged a conspiracy that ran "from in or about 2002 . . . up to and including [October 15, 2009]," the date the indictment was filed. In addition to the HP1607 flight, there was evidence that Cabalcante had also been involved in cocaine shipments that traveled by boat. Relevant here, there was evidence that in October 2009, Cabalcante paid $600,000 in American dollars to a cocaine trafficker named Victor Hugo Ramirez Estupinan ("Estupinan")[12] in exchange for 200 kilograms of cocaine. Estupinan testified at trial that he was going to transport the cocaine for Cabalcante from Ecuador to Panama and that he was aware that Cabalcante sold cocaine to the Zetas in Mexico. Estupinan

---

[12] From 2007 to 2008, Estupinan estimated that he sent over 70,000 kilograms of cocaine to the United States.

dispatched Cabalcante's 200 kilograms, along with 150 kilograms of his own cocaine, on a boat named the *Avante*. In early December 2009, American authorities intercepted the *Avante* and seized the cocaine.

After calling Estupinan back for questioning on the timing of the meeting between Estupinan and Cabalcante, the district court determined that the negotiations for the *Avante* deal occurred sometime in early October 2009, before the indictment was returned. The district court held that the evidence of the seized cocaine was therefore intrinsic. The district court held in the alternative that the evidence could come in under Rule 404(b) as extrinsic evidence. The jury also received a "similar acts" instruction, in which it was instructed that it could consider "acts of certain defendants . . . similar to those charged . . . , but which were committed on other occasions" for the purpose of determining whether the defendants had, among other things, "the state of mind and intent necessary to commit the crime charged[.]" We review the district court's evidentiary rulings for abuse of discretion, subject to harmless-error analysis. *See United States v. Boyd*, 773 F.3d 637, 644 (5th Cir. 2014).

Cabalcante argues that the evidence should not have come in under Rule 404(b) because the probative value of the evidence was substantially outweighed by its undue prejudice, as Rule 403 cautions against. We disagree. Intent was a significant issue in Cabalcante's trial. *See United States v. Cockrell*, 587 F.3d 674, 679 (5th Cir. 2009) ("The mere entry of a not guilty plea in a conspiracy case raises the issue of intent[.]"). And intent is a permitted use of extrinsic evidence under 404(b)(2). Evidence from the *Avante* demonstrated that Cabalcante conspired with others to distribute large quantities of cocaine with the intent that the drugs would be imported into the United States. This shows intent. And Estupinan's testimony alone was enough evidence for the jury to find that Cabalcante made the *Avante* deal. The *Avante* deal was similar to the HP1607 deal, in that it too involved the international transportation of

hundreds of kilograms of cocaine in exchange for American currency. Cabalcante was directly linked to both. Because the *Avante* evidence was highly probative on the element of intent, it was not an abuse of discretion for the district court to conclude that it satisfied Rule 403's balancing test. *See United States v. Heard*, 709 F.3d 413, 430–31 (5th Cir. 2013) (holding that it was not an abuse of discretion for the district court to admit extrinsic evidence because it was probative of the defendant's intent to further the objective of the charged conspiracy). The district court did not abuse its discretion in admitting, as well as instructing as to the proper use of, the *Avante* evidence.[13]

### 9. Denial of Jury Instruction on Withdrawal

Cabalcante also argues that the district court erred by refusing to give the Fifth Circuit's pattern instruction on withdrawing from a conspiracy.[14] We review the district court's failure to give a requested instruction for abuse of discretion. *Zamora*, 661 F.3d at 208.

Cabalcante argues that he withdrew from the conspiracy in May 2008 when he told an unidentified individual that the Colombians had to return the money they received from the Zetas for the failed HP1607 transaction. The agreement about the HP1607 deal, however, was made at some point around October 2007. Thus, the conspiracy offense was already complete by May 2008. *See Jimenez Recio*, 537 U.S. at 274 ("[T]he essence of a conspiracy is an 'agreement to commit an unlawful act.'"). Moreover, even though there is no overt-act requirement for a § 963 conspiracy, the defendants had already attempted (albeit unsuccessfully) to make good on the deal in December 2007.

---

[13] Cabalcante also challenges the district court's alternative ruling that the evidence was intrinsic. Because we conclude that the evidence was properly admitted to show intent under Rule 404(b), we need not address the intrinsic/extrinsic dichotomy.

[14] At the time, the pattern instruction was § 2.23. It is now § 2.18. *See* Fifth Circuit Pattern Jury Instructions (Criminal) § 2.18 (2015).

No. 13-40998

*See United States v. Salazar*, 751 F.3d 326, 331 (5th Cir. 2014) ("If the conspiracy does not even require the commission of an overt act, a defendant can never timely withdraw and can never negate liability as to the conspiracy charge."); Fifth Circuit Pattern Jury Instructions (Criminal) § 2.18, at 156 (2015) (noting that the withdrawal instruction "would not apply to conspiracies such as drug-trafficking conspiracies charged under [21 U.S.C. § 963], which do[es] not require proof of an overt act"). The district court therefore did not abuse its discretion in declining to give the withdrawal instruction.

**10.    Variance**

Cabalcante next argues that even if there was sufficient evidence to prove a conspiracy, the evidence pointed to multiple+ conspiracies, not the single conspiracy charged in Count One of the indictment. Without pointing to a contemporaneous objection, he contends on appeal that a material variance between the charged conspiracy and the proof at trial requires reversal of his conviction. He asserts that "Conspiracy 1" consisted of the participants connected to the HP1607 transaction (Cabalcante, Gaitan, Piñeda, and Moya), and "Conspiracy 2" consisted of El Tio, El Turko, Quinones, and Rojas.

"A material variance occurs 'when the proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense.'" *United States v. Mitchell*, 484 F.3d 762, 769 (5th Cir. 2007). If there was a variance, this court only reverses the defendant's conviction if the variance prejudiced his substantial rights. *Id.* "The question whether the evidence establishes the existence of one conspiracy (as alleged in the indictment) or multiple conspiracies is a fact question within the jury's province." *Simpson*, 741 F.3d at 548. This court should affirm the jury's finding that there was a single conspiracy "unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from

finding a single conspiracy beyond a reasonable doubt." *Id.* "Even where the evidence points to multiple conspiracies rather than the single conspiracy charged in the indictment, the variance does not affect the defendant's substantial rights as long as the government establishes the defendant's involvement in at least one of the proved conspiracies." *Mitchell*, 484 F.3d at 770. Notably, the district court gave a multiple conspiracy instruction.

We primarily consider three factors when counting the number of conspiracies: "(1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlapping of the participants in the various dealings." *Simpson*, 741 F.3d at 548. Here, all three factors support the jury's finding of a single conspiracy. First, the evidence demonstrated that all of the participants shared the common goal of profiting from importing cocaine into the United States. *See United States v. Morris*, 46 F.3d 410, 415 (5th Cir. 1995) (holding that there was a common goal when "[t]he overall objective or goal was for everyone in the conspiracy to profit from the illicit purchase and selling of cocaine"); *United States v. Maceo*, 947 F.2d 1191, 1196 (5th Cir. 1991) (holding same when "[t]he defendants' common purpose [was] importing cocaine into the United States for distribution"). "[T]hat . . . some of the participants changed does not affect [the] conclusion that the defendants and other co-conspirators had a common purpose." *Maceo*, 947 F.2d at 1196.

Looking to the second factor, the nature of the scheme, Cabalcante argues that different participants, drug quantities, and sources of supply demonstrated that there were two conspiracies. For this factor, however, this court "has moved away from a structural and formal examination of the criminal enterprise" and has "rejected an analysis of this factor based on wheels, charts, or other modes." *Morris*, 46 F.3d at 415. Instead, "the existence of a single conspiracy will be inferred where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect or to

the overall success of the venture, where there are several parts inherent in a larger common plan." *Simpson*, 741 F.3d at 549. Here, the plan and the path of travel for all of these deals—transporting cocaine from Colombia to Central America by plane and then to Mexico and ultimately the United States—demonstrate that there was a common scheme.

Finally, there was evidence that the participants overlapped. "[T]here is no requirement that every member must participate in every transaction to find a single conspiracy. Parties who knowingly participate with core conspirators to achieve a common goal may be members of an overall conspiracy." *Morris*, 46 F.3d at 416. Here, the government presented evidence that the central figure in this conspiracy was a Colombian man named Juan Guillermo Amaya Ñungo ("Ñungo"). Ñungo supplied the cocaine for the HP1607 deal and also negotiated deals with El Tio. Quinones and Gaitan were also common figures in these transactions. The two men worked "hand in hand" to coordinate airplane logistics; Quinones and Gaitan were also brothers-in-law. Gaitan coordinated the logistics for the HP1607 flight, and Quinones coordinated logistics for the transactions involving El Tio, El Turco, and Rojas. Thus, all three factors support the jury's finding the single conspiracy that was charged in the indictment. Hence Cabalcante's variance argument fails.

### 11.    Subpoena Request

For the first time on appeal, Moya argues that the district court erred by failing to subpoena Quinones to testify at trial. Moya contends that the government "hid" Quinones from him and "never allowed access to him" in violation of his Fifth and Sixth Amendment right to present Quinones as a

witness at trial.[15] Under the Sixth Amendment, Moya had the right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. Moya, however, never requested that the district court subpoena Quinones. Therefore, we review this issue for plain error. *See Snarr*, 704 F.3d at 382.

Moya filed a pretrial motion to compel the disclosure of *Giglio*[16] material and, in particular, the disclosure of "all information that could be considered as an inducement, agreement, immunity or other item of value that has been provided to Quinones . . . so that [it] may rightfully be investigated." He also requested that he "be put in contact with Sara Quinones so that he may determine if she is a proper witness in this case." Moya never indicated that he wanted to compel the testimony of either Quinones. The magistrate judge ordered the government to "produce to [Moya's] counsel the name of the attorney for David Quinones and Sara Quinones." The government provided that information, but, according to Moya, that attorney was not able to locate either Quinones. During trial, Furgason testified that Quinones was in the Eastern District of Texas. Moya, however, did not seek any additional relief during trial related to these potential witnesses. Instead, Moya filed a motion requesting that these individuals be produced as witnesses for sentencing, which the district court denied.[17] The district court was not required, on its

---

[15] Moya also asserts that the district court "refused" to compel the testimony of Freddy Correa and did not authorize funding for expert witnesses. Moya, however, does not include record citations in support of these arguments. He has failed to adequately brief these arguments. *See Scroggins*, 599 F.3d at 446–47.

[16] *See Giglio v. United States*, 405 U.S. 150 (1972).

[17] In his motion to produce, Moya stated that he wanted "to have David and Sara Quinones present in relation to his motion for new trial." Moya's motion for new trial, however, does not mention these potential witnesses; it discusses only the joint-venture issue.

own motion, to compel witnesses to testify on Moya's behalf at trial. Thus, Moya has not demonstrated plain error.

**12.    *Brady* and *Jencks***

For the first time on appeal, Moya argues that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it disclosed *Jencks*[18] material on the eve of trial. Moya never requested relief from the district court for the alleged *Brady* violation. Hence we review for plain error. *See United States v. Rounds*, 749 F.3d 326, 337 (5th Cir. 2014).

"To establish a *Brady* violation, the defendant must prove that (1) the prosecution suppressed evidence, (2) it was favorable to the defendant, and (3) it was material." *Id.* Here, before trial, the government turned over seventeen discs of *Jencks* material. At the pretrial conference, Cabalcante requested a continuance so that the defense could review this material and because he believed there was *Brady* material in the disclosure. Moya joined in the motion for continuance. Moya raised *Brady* concerns about a statement from a codefendant, Jairo Hernando Rodriguez Beltran ("Beltran"), that a certain flight bound for Venezuela was not a drug flight. The government responded that Beltran was on the government's witness list and that Moya could cross-examine Beltran at trial if he testified. The district court denied the request for a continuance and, as to the *Brady* issue, said that "I know what you have and how far you can use it."

Moya's *Brady* challenge fails for two reasons. First, he has not proven that the government suppressed evidence; to the contrary, the government disclosed the Beltran statement before the trial started. Second, Moya makes no effort to show that this disclosure was late. In particular, he cites no

---

[18] *See Jencks v. United States*, 353 U.S. 657 (1957).

evidence indicating when Beltran made this statement or when the government received it.

Moya contends that the government's failure to call Beltran at trial should constitute the withholding of exculpatory material. The government, however, said that it only "anticipate[d]" calling Beltran, and, in any event, the government was not obligated to call Beltran as a witness. Moya received Beltran's statement before trial but never made any requests to compel Beltran's testimony.[19] Hence his *Brady* challenge fails.

### 13.     Statutory and Constitutional Speedy-Trial Rights

Moya argues that the district court erred by denying his motion to dismiss the indictment for violation of his statutory and constitutional speedy-trial rights. With respect to the Speedy Trial Act, we review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Dignam*, 716 F.3d 915, 920 (5th Cir. 2013).

The Speedy Trial Act requires that trial must begin within seventy days of the later of "the filing date . . . of the information or indictment, or . . . the date the defendant has appeared before a judicial officer of the court in which such charge is pending[.]" 18 U.S.C. § 3161(c)(1). The burden of proving speedy-trial violations falls on the defendant. *Id.* § 3162(a)(2). Here, Moya seeks to count toward his speedy-trial total the time that passed from the date of his arrest in Colombia until the date the trial began. But by the plain terms of the statute, Moya's arrest did not start the speedy-trial clock. At the earliest,

---

[19] In his brief, Moya asserts that he subpoenaed Beltran, but that Beltran's attorney would not let him testify for Moya. Moya provides no record support for this assertion. And our unassisted review of the record supports the opposite conclusion: in Moya's pretrial ex parte motion for subpoenas, Beltran was not one of the seven witnesses for which Moya requested a subpoena.

No. 13-40998

Moya's speedy-trial clock started on the date of his first judicial appearance: January 18, 2011.[20]

The Act authorizes eight types of delay that will toll the speedy-trial clock, *see id.* § 3161(h), three of which are relevant here. First, the district court designated this case as complex on December 1, 2010, under § 3161(h)(7)(B)(ii), and granted a continuance that tolled the seventy-day limit until March 7, 2011.

Second, under § 3161(h)(6), "the speedy trial clock does not begin to run in a multi-defendant prosecution until the last codefendant makes his initial appearance in court." *United States v. Harris*, 566 F.3d 422, 428 (5th Cir. 2009). In this case, the last codefendant (Orlando Castano Mendez) made his initial appearance on September 23, 2011. Thus, Moya's speedy-trial clock did not start running until September 23, 2011.

Finally, several defendants, including Moya, requested continuances, which the district granted and which further tolled the speedy-trial clock. 18 U.S.C. § 3161(h)(7)(A). The government also filed a continuance motion, which the district court granted. In the end, the total number of non-excludable days between the last codefendant's initial appearance and the first day of trial did not exceed the statutory period. Thus, Moya has not shown that his rights under the Speedy Trial Act were violated.

Moya also asserts a violation of his constitutional speedy-trial rights. Although the standard of review for a Sixth Amendment speedy-trial claim is "unsettled," *Harris*, 566 F.3d at 431–32, we find no violation even on de novo review. Thus, it is unnecessary to resolve which standard of review applies to the constitutional component of Moya's speedy-trial claim. As we have previously observed, "[i]t will be the unusual case . . . where the time limits

---

[20] The indictment in this case was publicly filed on October 15, 2009.

under the Speedy Trial Act have been satisfied but the right to a speedy trial under the Sixth Amendment has been violated." *Id.* at 432. This case is no exception.

To determine whether a defendant's Sixth Amendment right to a speedy trial has been violated, this court balances four factors: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant diligently asserted his right; and (4) whether the defendant suffered prejudice. *See id.* The court can presume prejudice if the first three factors weigh heavily in the defendant's favor; if they do not, the defendant must show actual prejudice. *Id.*

On the first factor, "delays of less than five years are not enough, by duration alone, to presume prejudice." *Id.* Here, the indictment was filed in October 2009, Moya was arrested in Colombia in February 2010, Moya was extradited to the United States in January 2011, and the trial started in October 2012. The first factor does not weigh in Moya's favor. The second factor, the reason for the delay, also cuts against Moya. As shown above, the district court designated this multi-defendant case as complex, and the defendants requested several continuances. Likewise, on the third factor, whether the defendant diligently asserted his speedy-trial right, we note that Moya himself requested a continuance in January 2012, a year after his extradition, and that he never opposed his codefendants' multiple continuance motions.

Because the first three factors weigh against him, Moya must show actual prejudice. *Harris*, 566 F.3d at 433. Moya argues that he suffered prejudice because three witnesses either died or disappeared before trial. This "blanket statement," however, "gives no indication as to the content and relevance of the lost testimony, and how its absence impaired [Moya's]

No. 13-40998

defense." *Harris*, 566 F.3d at 433. Thus, Moya has not shown actual prejudice. His constitutional claim therefore fails.

### 14.     District Court's Comments to Jury

Rojas argues that he was denied a fair trial because the district court commented, in front of the jury, that his attorney was an "expert in wasting time." When reviewing a claim of judicial misconduct, this court's "role is to determine whether the judge's behavior was so prejudicial that it denied the defendant a fair, as opposed to a perfect, trial." *United States v. Bermea*, 30 F.3d 1539, 1569 (5th Cir. 1994). "[T]he nature of [the district court's] interruptions is . . . pertinent to [this] inquiry." *Id.* at 1570.

Here, after the government recalled a witness who had testified earlier in the trial but had been temporarily excused, Rojas's counsel objected under Federal Rule of Evidence 611, arguing that the government "already called the witness once. [It] doesn't get to call him twice. . . . [The government] can't just keep calling the same witnesses over and over." The district court observed that Rule 611 gives the court discretion to "exercise reasonable control over the order of examination of witnesses and presenting of evidence" and "to make the procedures effective for determining the truth, avoid wasting time, and protect the witnesses from harassment or undo embarrassment." Rojas's attorney then responded: "Exactly. The wasting of time. If you can only call them once, you have to be prepared with the questions you're going to ask them, and you have to know what you are trying to prove. That's why you only get to call them once."

At that point, in front of the jury, the district court said, "I think you have been an expert in wasting time." Counsel responded: "Your Honor, did I hear you to say you think I'm an expert in wasting time?" The district court elaborated: "It seems to me that the last few examinations have been really long, tenuous, and you've made your points and just kept beating a dead horse."

41

Rojas's counsel then apologized and said that he would "do [his] very best . . . to conserve the Court's time." The district court finally responded, "That would be good. . . . And you're not alone in this problem."

While the jury was on recess, Rojas moved for a mistrial based on the district court's comment that Rojas's counsel was an "expert in wasting time." The district court denied the motion, noting that it was Rojas's counsel who had brought up Rule 611 and that the district court's comment that "you were not alone in that problem" had related the problem to all counsel. The district court nevertheless told the jury when it returned that "[w]e're going to try not to waste time in this case and streamline matters as much as possible, but it is difficult with the number of witnesses involved and the language barrier and the interpreting. It takes more time than a usual case."

Looking at the challenged comment in context, we conclude that, although the district court may have lost its patience in the presence of the jury, the comment did not deprive Rojas of a fair trial. The district court made the comment after Rojas's counsel had questioned the district court's management of the case under Rule 611. Moreover, the comment was not directed solely at Rojas's counsel; as the district court noted, he was "not alone in this problem." Finally, any prejudice that might have resulted from the comment should have been alleviated by the district court's later comment that the parties and the court were "going to try not to waste time in this case."[21] Thus, the "wasting time" comment did not deprive Rojas of a fair trial. *See Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 437 (6th Cir. 2009)

---

[21] The district court also later instructed the jury "not to assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case." The district court went on to state: "Except for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts." We have previously held that a curative instruction like this one "can operate against a finding of constitutional error." *Bermea*, 30 F.3d at 1571–72.

(declining "to upset a jury verdict on the grounds of a few impolite comments by the trial judge" after the judge commented to plaintiffs' counsel that "you sure are wasting a lot of time").

### 15.    Government's Focus on the American Dollar in Rebuttal

Cabalcante and Piñeda next argue that the government's rebuttal argument was improper because it focused on the use of American dollars as part of the cocaine transactions in question, even though the government had not mentioned the American dollar in its opening summation.

In the challenged portion of its rebuttal argument, the government argued that it was relevant that the cocaine deals were paid for in American dollars because it was evidence that the defendants intended or knew that the cocaine would be imported into the United States. The district court held that the government's argument about the dollar was proper rebuttal argument because it made this argument in response to the defendants' argument that the government had not proven that the defendants intended to import cocaine into the United States. "The prosecution [is] entitled to make a fair response in rebuttal to the arguments of defense counsel." *United States v. Vaccaro*, 115 F.3d 1211, 1217 (5th Cir. 1997). In their closing arguments, the defense repeatedly argued that the government had failed to prove intent to import. The government's argument about the American dollar in rebuttal was proper because the defense had opened the door to responsive arguments about the defendants' intent. Hence the district court's ruling was not error.

### 16.    Drug-Quantity Determination

Moya and Rojas argue that the district court erred by finding them each responsible for 150 kilograms of cocaine for sentencing purposes. "[D]rugs used in calculating a defendant's base offense level include both those drugs in the distribution of which he was directly involved, and those drugs foreseeably distributed in furtherance of the conspiracy." *United States v. Franklin*, 148

F.3d 451, 460 & n.40 (5th Cir. 1998) (citing U.S.S.G. § 1B1.3(a)(1)(B)). The amount of drugs attributable to a defendant for purposes of sentencing "need not be limited to the actual quantities seized; the district judge can make an estimate." *Medina*, 161 F.3d at 876. For example, in *Medina*, the court inferred the drug amount attributable to the defendant based on the number of border crossings and the smallest amount of cocaine that was seized during one crossing. *See id.* at 877. A preponderance of the evidence must support the drug-quantity determination. *See id.* at 876.

Moya objected to the presentence report's drug-quantity determination in the district court. Hence we review the district court's quantity determination with respect to Moya for clear error. *See id.* Here, the jury found that the defendants' conspiracy involved five or more kilograms of cocaine. The district court estimated the quantity of drugs attributable to Moya on the basis of the capacity of the planes that the conspiracy used to transport cocaine. Moya's PSR observed that "[t]he planes used to transport cocaine had a flight capacity of well over 150 kilograms" and that, as an example, the authorities had seized over 600 kilograms from a plane that Piñeda had piloted. On that basis, the PSR attributed 150 kilograms to Moya. Moya challenged that recommendation in his objections to the PSR. At sentencing, Moya requested that the district court hold him responsible for only five kilograms of cocaine— the minimum amount charged in the indictment—because "there was no evidence that Mr. Moya Buitrago ever had anything to do with any cocaine in this case." The district court reminded Moya that the jury had found him guilty, and the court found that the evidence supported that Moya was involved with at least 150 kilograms of cocaine because Moya guided at least one flight and "the one flight is going to get you to 150."

The government presented evidence at trial that Moya was involved as an air traffic controller with at least two drugs flights: a flight on November

18, 2007 (the day he exchanged twenty-seven phone calls with Gaitan) and the HP1607 flight. The HP1607 flight alone likely involved at least 1,000 kilograms of cocaine because that transaction was worth nearly $8 million. And although there was no direct evidence of the amount of cocaine on the November 18 flight, 150 kilograms was a reasonable, perhaps even low, estimate. One pilot who worked for the Sinaloa cartel testified, for example, that drug flights from Colombia to Central America typically involved 1,500 to 2,000 kilograms of cocaine. Moreover, in December 2008, Colombian authorities seized 631 kilograms of cocaine from a flight that Piñeda piloted. The district court did not clearly err by finding Moya responsible for 150 kilograms.

Rojas also challenged the drug quantity that the district court attributed to him for sentencing purposes. Rojas's PSR recommended that Rojas was also "responsible for coordinating and collaborating with coconspirators the exportation of at least 150 kilograms of cocaine." Rojas filed objections to the PSR, but he did not object to the drug-quantity determination, and the district court adopted the PSR's findings without change. Thus, for Rojas, review is for plain error. *See United States v. Baptiste*, 309 F.3d 274, 277 (5th Cir. 2002).

On appeal, Rojas filed a supplemental brief joining all other arguments that his co-appellants raised. In this brief, he emphasized that he was joining Moya's argument on this drug-quantity issue, but he did not provide any factual detail specific to Rojas. An argument on a drug-quantity determination is a fact- and defendant-specific argument that cannot be adopted under Federal Rule of Appellate Procedure 28(i). *See United States v. Cantu–Ramirez*, 669 F.3d 619, 632 n.4 (5th Cir. 2012) (noting that a defendant cannot adopt his codefendant's claims about the particulars of the codefendant's sentence because that issue was fact specific). Thus, by not individually briefing the drug-quantity issue in his supplemental brief, Rojas waived any

arguments on this issue. *See Scroggins*, 599 F.3d at 446–47. In any event, the trial evidence summarized above demonstrated that Rojas was involved in two cocaine deals from which the authorities seized over 1,000 kilograms of cocaine. Thus, Rojas's drug-quantity argument would fail even if it had been properly briefed.

**17.    Special Skills Enhancement for Moya**

Moya argues that the district court erred by applying a special skills enhancement when calculating his sentencing guidelines range. The sentencing guidelines provide for a two-level increase to a defendant's base offense level if the defendant used a "special skill[] in a manner that significantly facilitated the commission or concealment of the offense[.]" U.S.S.G. § 3B1.3. We review for clear error a district court's application of this enhancement. *United States v. Burke*, 431 F.3d 883, 889 (5th Cir. 2005).

Moya's PSR recommended the enhancement because Moya used his skills as an air traffic controller to assist drug flights in evading the Colombian Air Force. Moya objected to this enhancement, both in the district court and on appeal, on the ground that there was no evidence that he ever assisted a drug flight. The district court overruled the objection. On the enhancement issue, Moya does nothing more than repeat his sufficiency argument. As shown above, that argument fails. Hence the district court did not clearly err in applying the enhancement.

**18.    Pilot Enhancement for Piñeda**

Piñeda argues that the district court erred by applying a pilot enhancement when calculating his sentencing guidelines range. The sentencing guidelines provide for a two-level increase to a defendant's base offense level "[i]f the defendant unlawfully imported or exported a controlled substance under circumstances in which . . . the defendant acted as a pilot . . . aboard any craft . . . carrying a controlled substance." U.S.S.G. § 2D1.1(b)(3).

No. 13-40998

Piñeda's presentence report recommended that this enhancement applied to Piñeda because he acted as "a pilot . . . aboard an aircraft carrying a controlled substance." In his objections to the PSR, Piñeda argued that there was no evidence that he was a pilot. The district court overruled the objection and noted that the PSR reported that Piñeda completed three years of pilot school in Colombia and had a pilot's license.

On appeal, Piñeda abandons his argument that the pilot enhancement should not apply because there was no evidence that he was a pilot. Instead, he contends that the enhancement should not apply because there was no evidence that cocaine was actually imported into the United States. Piñeda did not raise this argument in the district court, so we review for plain error. *See United States v. Cedillo–Narvaez*, 761 F.3d 397, 402 n.2 (5th Cir. 2014) (reviewing for plain error when the defendant did not make the legal arguments challenging an enhancement in the district court even though he objected to the factual predicate for the enhancement).

Piñeda argues that, under 2D1.1(b)(3)(C), cocaine must actually be "imported" for the upward enhancement to apply. He contends that, here, "it was undisputed that no cocaine ever left [Colombia]," so the enhancement should not apply. He further contends the Eleventh Circuit's decision in *United States v. Chastain*, 198 F.3d 1338 (11th Cir. 1999), supports this result. In *Chastain*, however, the Eleventh Circuit interpreted a guidelines section equivalent to current subsection 2D1.1(b)(3)(A),[22] not current subsection 2D1.1(b)(3)(C),[23] the section at issue here. *See id.* at 1353. With respect to the subsection 2D1.1(b)(3)(A) equivalent, the Eleventh Circuit held that "the

---

[22] At the time the Eleventh Circuit decided Chastain, the subsection that is now 2D1.1(b)(3)(A) appeared at 2D1.1(b)(2)(A).

[23] At the time the Eleventh Circuit decided Chastain, the subsection that is now 2D1.1(b)(3)(C) appeared at 2D1.1(b)(2)(B).

language of the guideline clearly contemplates a completed event, an actual importation." *Id.* Since then, the Eleventh Circuit itself has reached an opposite conclusion with respect to current subsection (C). *See United States v. Rendon*, 354 F.3d 1320, 1330–31 & n.7 (11th Cir. 2003).

To see why the two subsections merit different treatment, it is helpful to read them side-by-side. The guidelines provide, in relevant part:

> If the defendant unlawfully imported or exported a controlled substance under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier *was used to import or export* the controlled substance, . . . or (C) the defendant acted as a pilot, copilot, captain, navigator, flight officer, or any other operation officer aboard any craft or vessel carrying a controlled substance, increase by 2 levels.

U.S.S.G. § 2D1.1(b)(3) (emphasis added). Subsection (A) contains the language "used to import," while subsection (C) does not—a point that the Eleventh Circuit observed in *Rendon*, when it interpreted a guidelines section equivalent to current subsection (C).[24] *See* 354 F.3d at 1330–31 & n.7. It held that subsection (C) "impose[d] the enhancement based on the *role* of the defendant in the subject importation or exportation," not on whether a plane had been "used to import." *See id.* at 1330–31 n.7. Although the court in *Rendon* noted that the introductory phrase of the guideline used past-tense verbs—"[i]f the defendant unlawfully imported or exported a controlled substance"—it explained that "the general heading of § 2D1.1 provides that the adjustments in § 2D1.1 apply to not only substantive drug offenses, but also to attempt and conspiracy." *Id.* at 1330. Indeed, the guideline is titled, "Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession

---

[24] At the time the Eleventh Circuit decided *Rendon*, the relevant guideline was still 2D1.1(b)(2)(B). *See* n.24, *supra*. That guideline provision now appears at subsection 2D1.1(b)(3)(C).

with Intent to Commit These Offenses); *Attempt or Conspiracy*." U.S.S.G. § 2D1.1 (emphasis added); *see also id.* § 2X1.1(a) (explaining that the offense level for the crimes of conspiracy and attempt is "[t]he base offense level from the guideline for the substantive offense, *plus any adjustments from such guideline* for any intended offense conduct that can be established with reasonable certainty" (emphasis added)).

Here, as summarized above, the government presented evidence at trial that Piñeda acted as a pilot on the December 2008 flight that carried over 600 kilograms of cocaine.[25] "It simply does not matter that his [aircraft] was stopped before the actual importation was completed." *Rendon*, 354 F.3d at 1330; *see also United States v. Rodríguez*, 215 F.3d 110, 124 (1st Cir. 2000) (characterizing the argument that subsection (C) requires actual importation as "frivolous"). Thus, the district court did not plainly err in applying the pilot enhancement to Piñeda. *See United States v. Ceballos*, 789 F.3d 607, 617 (5th Cir. 2015).

### 19.    Substantive Reasonableness of Rojas's Sentence

Rojas challenges the substantive reasonableness of his sentence. On appeal, Rojas asserts that he never obstructed justice or physically or financially harmed anyone. He argues that, as a result, his sentence should have been lower. He also contends that his sentence was unreasonable because he is "not a hardened criminal, but rather, a son, a father, a husband, and a hardworking member of society." He did not make these arguments below; instead, he raised only a general objection to the substantive reasonableness

---

[25] Under the terms of Piñeda's extradition, Piñeda was not tried on the conspiracy count and no evidence arising from the December 8, 2008 flight could be used as evidence of Piñeda's guilt on the distribution count. The jury's special verdict for Piñeda ensured that the United States complied with this agreement. But, as relevant here, the agreement does not appear to apply to sentencing, and the district court "may consider all 'relevant conduct' when fashioning a sentence." *United States v. Bacon*, 646 F.3d 218, 221 (5th Cir. 2011).

of his sentence. When a defendant "fail[s] to object on specific grounds to the reasonableness of his sentence, thereby denying the court the opportunity to identify and correct any errors, we review for plain error." *United States v. Dunigan*, 555 F.3d 501, 506 (5th Cir. 2009).

Rojas's guidelines range was 235 to 293 months. The district court imposed concurrent 235-month sentences on both counts, explaining that a sentence at "the bottom of the guidelines would be appropriate." When a sentencing court "impose[s] a sentence within a properly calculated Guidelines range," "it will be rare for a reviewing court to say such a sentence is 'unreasonable.'" *United States v. Smith*, 440 F.3d 704, 706–07 (5th Cir. 2006). After reviewing the record, we conclude that the district court properly weighed the 3553(a) factors at sentencing. Thus, it did not plainly err in sentencing Rojas to 235 months' imprisonment.

**20.      District Court's Decision Not to Consider Possible Charges That Rojas Might Face in Colombia in the Future**

Rojas argued at sentencing, and now argues on appeal, that the district court had "inadequate information" when it sentenced him because it did not know whether Rojas would face charges in Colombia for his criminal conduct in this case. When a defendant properly raises an objection to a sentence in the district court, we review the sentence for reasonableness under an abuse-of-discretion standard. *United States v. Johnson*, 619 F.3d 469, 471–72 (5th Cir. 2010).

Rojas has not provided any evidence that he will be charged in Colombia for his criminal conduct in this case. The district court recognized as much at sentencing when it overruled Rojas's objection on this issue, saying, "I think as to what may or may not happen in Colombia is totally speculative; and obviously arguments can be made there about any sentence that he receives in the United States to be adequate for that. I have no idea what the prisons are

like or whether he would even face it, but I have no indication he's charged with anything in Colombia." The district court did not abuse its discretion by declining to take into account completely speculative future charges Rojas might face in Colombia. *Cf. United States v. Hilario*, 449 F.3d 500, 502 (2d Cir. 2006) (per curiam) ("[T]he district court did not abuse its discretion when it declined to depart on the basis of [the defendant's] wholly speculative argument that a foreign sovereign might sentence his co-defendant to a lesser sentence than would generally be warranted under the United States Sentencing Guidelines."). Hence this argument fails.

## III.

For the forgoing reasons, the judgment of the district court is AFFIRMED.