# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-40124

UNITED STATES OF AMERICA,

> Plaintiff-Appellee,

v.

MIGUEL ANGEL RIVAS-ESTRADA; JUSTA CENTENO-HERRERA; FELIPA TORRES-LOPEZ,

> Defendants-Appellants.

United States Court of Appeals
Fifth Circuit

**FILED**

February 18, 2019

Lyle W. Cayce
Clerk

Appeals from the United States District Court
for the Eastern District of Texas
USDC No. 4:15-CR-1

Before JONES, HAYNES, and OLDHAM, Circuit Judges.

PER CURIAM:*

Miguel Angel Rivas-Estrada, Felipa Torres-Lopez, and Justa Centeno-Herrera were convicted of conspiracy to launder money in violation of 18 U.S.C. § 1956(h). Rivas-Estrada was also convicted of conspiracy to possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846. All three appeal their convictions. We affirm.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-40124

I.

On January 28, 2013, the Arkansas State Police stopped a Hyundai Tiburon. They discovered hidden compartments behind the car's speakers. There they found 18.64 kilograms of 93%-pure methamphetamine. That discovery sparked a two-year investigation into a massive drug-trafficking conspiracy and vast money laundering operations from North Texas to Mexico. We describe in turn each defendant's connections to these criminal enterprises.

A.

Rivas-Estrada (a.k.a. "Miguelito" and "El Gato") was a leader of a drug-trafficking organization; we refer to it as the Estrada DTO. Rivas-Estrada owned the Hyundai Tiburon that triggered the investigation. He was not in the car when the Arkansas State Police stopped it. But one occupant had "Miguelito" tattooed on her back, and her cell phone had an incoming call from Rivas-Estrada and contact information for the Estrada DTO's "meth cook." The other occupant's cell phone had a video of Rivas-Estrada, a text message to Rivas-Estrada saying "we already left Texarkana," two incoming calls from Rivas-Estrada, photographs of methamphetamine, and a text message to the Estrada DTO's "meth cook"—all date stamped within a week of the traffic stop.

The search of Rivas-Estrada's car led the Government to uncover two other drug-trafficking organizations: the Valencia DTO and the Lozano DTO. All three DTOs smuggled methamphetamine from Michoacán, Mexico to the United States. A federal agent testified that 99% of methamphetamine found in the United States today is produced in Michoacán. Once the drugs were smuggled to the United States, a network of distributors sold them in North Texas and elsewhere, generating millions of dollars in cash.

The DTOs needed to launder the cash to get their profits back to Mexico. In addition to coordinating methamphetamine distribution, Rivas-Estrada directed these money laundering operations.

2

No. 17-40124

Rivas-Estrada's cousin, Laura Zulema Torres ("Zulema"), a cooperating Government witness, described the money laundering scheme. The Estrada DTO's couriers brought the drug money to a safe house, counted it, and then placed it in nondescript containers like gift bags, shoe boxes, and suitcases. The couriers then took the containers to otherwise-legitimate money transfer businesses that were willing (usually for an extra fee) to launder it.

The couriers sent the money to designated recipients in Michoacán. For the sender information, the couriers would just make up "any name." But Rivas-Estrada provided the money couriers with specific recipients in Mexico. The couriers structured their transactions to avoid reporting requirements for transactions over $1,000. For example, to wire $20,000, the courier would send at least 21 different wires; all 21 would go to designated recipients in Mexico but come from different fake-named senders in America. Rivas-Estrada taught Zulema all these techniques. She wired many thousands of dollars for the Estrada DTO—sometimes twice a day.

The Valencia and Lozano DTOs used the same money laundering system as the Estrada DTO. Their couriers visited the same money services businesses. And they sent similarly structured wires to many of the same recipients in Michoacán.

B.

Defendants Torres-Lopez and Centeno Herrera operated three of the money services businesses that laundered money for the DTOs.

1.

Torres-Lopez operated Cumbia Records. She had been trained to identify money laundering. She learned to identify suspicious activities such as clustered transactions; fake names, phone numbers, or addresses; structuring; and sending funds to a "high risk corridor" like Michoacán.

3

No. 17-40124

Zulema explained that she used Cumbia Records to launder money because Torres-Lopez did not ask her for identification. Torres-Lopez allowed Zulema to wire as much as $10,000 in a single visit, structured into increments of just under $1,000 per transfer. These are known "red flags" for money laundering, but Torres-Lopez never objected or reported anything. In fact, she even helped Zulema come up with the fake sender names.

Another cooperating courier testified that he regularly used Cumbia Records to launder money. He sent between $20,000 and $40,000 to Mexico at a time. Each transaction was completed under a fake name and structured to avoid reporting requirements. Torres-Lopez turned off the security cameras when he arrived. At one point, she suggested the courier tell people he was a pastor sending funds for a church in Mexico.

Torres-Lopez's son, Armando Tlaseca, worked at Cumbia Records. He suspected customers were laundering money. But his mother told him to conduct the transfers without asking questions. Tlaseca eventually became a money courier for the Valencia DTO. But evidence showed he was also involved in handling money belonging to Rivas-Estrada, indicating a connection between the Valencia and Estrada DTOs. Tlaseca was indicted, pleaded guilty, and cooperated with the Government.

2.

Defendant Centeno-Herrera operated two money service businesses during the conspiracy period: Rizo's and Variedades Esperanza. Centeno-Herrera's daughter, Luvy Guevera, cooperated with the Government and testified to her mother's knowing participation in money laundering.

Rizo's was another money services business Zulema used to launder money for the Estrada DTO. She conducted multiple transactions in a single visit and structured the transactions to avoid reporting. Centeno-Herrera

4

entered the fabricated sender data for each transaction. Sometimes, Centeno-Herrera herself would make up the fake sender information for Zulema.

Another courier regularly dropped off bags of cash at Variedades Esperanza for Centeno-Herrera to wire. She structured the wires and came up with fake sender names for him. When Centeno-Herrera was finished, she would call the courier and say his "order was ready"—the signal to pick up receipts.

Like Torres-Lopez, Centeno-Herrera had completed training to spot "red flags" for money laundering. And, like Torres-Lopez, she never reported any of the myriad red flags that popped up at her businesses.

In April 2015—as the investigation was drawing to a close—federal agents interviewed Centeno-Herrera and Guevara. Agents showed both women evidence of money laundering at Variedades Esperanza, including suspicious transaction records. Centeno-Herrera denied any illegal activity but could not explain the suspicious transactions. Even after this warning, Centeno-Herrero continued to launder money for the DTOs.

C.

On October 7, 2015, law enforcement officers executed simultaneous search warrants on the DTOs' safe houses. Officers found computer records with Skype activity from "Gato," a drug ledger stating that "El Gato" oversaw drug distribution, and numerous receipts from Torres-Lopez's and Centeno-Herrera's money services businesses. At one of the safe houses, they found approximately 22 kilograms of methamphetamine stored in an air-conditioning duct.

The government indicted thirty people for conspiracy to traffic methamphetamine and conspiracy to launder money. *See* 21 U.S.C. § 846; 18 U.S.C. § 1956(h). Most of them pleaded guilty, and many of them testified for

No. 17-40124

the Government. Rivas-Estrada, Centeno-Herrera, and Torres-Lopez went to trial.

The jury found Rivas-Estrada guilty on both counts. It found Centeno-Herrera and Torres-Lopez guilty of the money laundering conspiracy, 18 U.S.C. § 1956(h), but acquitted them of the drug-trafficking conspiracy, 21 U.S.C. § 846. All three Appellants timely appealed.

## II.

Rivas-Estrada, Torres-Lopez, and Centeno-Herrera appeal their convictions. We affirm.

## A.

We begin with Rivas-Estrada. He argues there is a fatal variance between the indictment and the proof at trial. The indictment alleged a single drug-trafficking and a single money laundering conspiracy involving all thirty indicted co-defendants. The proof at trial, he says, showed the Estrada, Valencia, and Lozano DTOs were separate conspiracies. Because his DTO was separate, Rivas-Estrada says, he should not have been tried in the Eastern District of Texas. Nor should the judge have used the co-conspirator exception to the hearsay rule to admit statements regarding the Valencia and Lozano DTOs.

As a threshold matter, the parties dispute whether Rivas-Estrada preserved his variance objection at trial. We need not decide the question because the result would be the same regardless of whether the variance issue was preserved. Even reviewing *de novo*, we find no error.

Rivas-Estrada shoulders a heavy burden to prove a fatal variance. "We will affirm the jury's finding that the government proved a single conspiracy unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a

No. 17-40124

single conspiracy beyond a reasonable doubt." *United States v. Mitchell*, 484 F.3d 762, 769 (5th Cir. 2007) (quotation omitted).

There was no material variance. The Government put on evidence linking Rivas-Estrada to the Lozano and Valencia DTOs. All three DTOs wired money to many of the same recipients in Mexico, which allows an inference of overlap and a common scheme. *See United States v. Rojas*, 812 F.3d 382, 406–07 (5th Cir. 2016). Rivas-Estrada argues Tlaseca worked for the Valencia organization; but on at least one occasion, Tlaseca was entrusted with moving funds belonging to the Estrada DTO. A Valencia DTO courier handling Estrada DTO money certainly suggests an overlapping conspiracy. This was sufficient evidence to allow the jury to so find.[1]

Even assuming a material variance, any error would be harmless. A variance is fatal only if it is such "as to 'affect the substantial rights' of the accused." *Berger v. United States*, 295 U.S. 78, 82 (1935) (citation omitted); *see also Mitchell*, 484 F.3d at 769. We have explained that "[e]ven where the evidence points to multiple conspiracies rather than the single conspiracy charged in the indictment, the variance does not affect the defendant's substantial rights as long as the government establishes the defendant's involvement in at least one of the proved conspiracies." *Mitchell*, 484 F.3d at 770; *see also Rojas*, 812 F.3d at 406; *United States v. Faulkner*, 17 F.3d 745, 762 (5th Cir. 1994). The government met that requirement here based on overwhelming evidence Rivas-Estrada was involved in (at least) his eponymous DTO.

---

[1] Tlaseca's statements were thus properly admitted as statements of a co-conspirator, and his overt acts in the Eastern District of Texas mean venue was proper in there as to Rivas-Estrada. *See United States v. Caldwell*, 16 F.3d 623, 624 (5th Cir. 1994). We therefore need not reach the Government's suggestion that similar money laundering methods alone are sufficient to prove a single conspiracy.

No. 17-40124

For example: Over 18 kilograms of 93%-pure methamphetamine were found in hidden compartments in his car. Computer and cell phone records, as well as testimony, connected him to the methamphetamine in the car and to admitted conspirators. What's more, he personally delivered $110,000 in illegal drug proceeds to a federal agent posing as a money courier. And he was on his way to Texas to direct the drug distribution ring when he was apprehended trying to cross the border. That makes any variance harmless. *See Mitchell*, 484 F.3d at 770–71.

Rivas-Estrada contends *Mitchell*'s harmlessness rule does not apply because the jury was not given a precautionary instruction. Though we have noted such instructions were given in cases finding harmlessness, *see, e.g.*, *Rojas*, 812 F.3d at 406; *Mitchell*, 484 F.3d at 770–71; *Faulkner*, 17 F.3d at 760, we've never required such an instruction. To the contrary, we have explained that "where the indictment alleges a single conspiracy and the evidence established each defendant's participation in at least one conspiracy a defendant's substantial rights are affected only if the defendant can establish reversible error under general principles of joinder and severance." *Mitchell*, 484 F.3d at 770–71 (quotation omitted).

Rivas-Estrada does not claim there was a joinder or severance error. In the district court, he objected to hearsay statements by any declarants not shown to be his co-conspirators, but he did not argue joinder was improper or seek a severance. Nor does he seriously advance such an argument here. He instead argues the Government's theory linked the DTOs through their use of common money services businesses, so the acquittal of the money services defendants as to the drug-trafficking conspiracy "severed" the connection. But joinder is determined based on the indictment. *Faulkner*, 17 F.3d at 758. And he never asked for severance based on how the evidence unfolded at trial. *Cf. United States v. McRae*, 702 F.3d 806, 828 (5th Cir. 2012) (finding it was

8

No. 17-40124

error to deny a motion to sever urged at the close of the Government's case because of evidence developed at trial).  The jury's verdict cannot make a proper joinder retrospectively improper.[2]

B.

Rivas-Estrada also argues he was prejudiced by inadmissible hearsay and improper character evidence in violation of Federal Rule of Evidence 404. We review for abuse of discretion.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997).

First, Rivas-Estrada challenges the admission of evidence that he was apprehended trying to enter the United States "illegally."  At trial, an agent explained he had been "apprehended . . . trying to illegally enter the U.S."  The government contends this evidence was intrinsic to the crime charged because it explained certain acts taken by others, explained why he was in custody in 2015, and established the relationship between Rivas-Estrada and certain co-conspirators.  We agree with the Government.  Evidence explaining the circumstances of a defendant's arrest is generally intrinsic, as is evidence putting the conspiracy into context.  *See, e.g.*, *United States v. Jimez-Elvirez*, 862 F.3d 527, 536 (5th Cir. 2017); *United States v. Yi*, 460 F.3d 623, 633 (5th Cir. 2006).

Even if the detail regarding illegality were extrinsic, Federal Rule of Evidence 404(b) permits evidence of a prior act where it is "relevant to an issue other than the defendant's character" and is admissible under Rule 403. *United States v. Jimenez-Elvirez*, 862 F.3d 527, 536 (5th Cir. 2017) (quotation

---

[2] In his reply brief, Rivas-Estrada suggests improperly admitted evidence of unrelated conspiracies "resulted in a greater sentence than he would have received otherwise."  Rivas-Estrada forfeited any challenge to his sentence by not raising it in his opening brief and failing to explain how his sentence was affected.  *United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010).

omitted). Rivas-Estrada's *detention* was relevant to provide context for certain events. The district court's Rule 404(b) limiting instruction cured any potential error arising from the additional detail that he was trying to enter the country "illegally."

Second, Rivas-Estrada contends the district court should not have admitted recordings of his telephone calls with his wife and, separately, with his girlfriend. The conversations were mostly "about family matters," he says, and they "probably served as inadmissible character evidence given that they showed [he] was supporting two families and had children with both his wife and girlfriend." He also contends the women's statements on the recordings were inadmissible hearsay.

We begin with whether the women's out-of-court statements were admissible under a hearsay exception. A co-conspirator statement is admissible if the Government "prove[s] by a preponderance of the evidence: (1) the existence of the conspiracy; (2) the statement was made by a co-conspirator of the party; (3) the statement was made during the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." *United States v. Hall*, 500 F.3d 439, 443 (5th Cir. 2007). The Government met that burden here. It established both Ms. Vargas (Rivas-Estrada's wife) and Ms. Chavez (his girlfriend) were co-conspirators. Evidence showed Ms. Chavez, who lived in Texas, was a money courier for the Estrada DTO. And both recordings referred to events related to the conspiracy. Ms. Vargas, who lived in Mexico, discussed money "held back" by a damming order—which the Government had obtained to stem the flow of money to Mexico during the investigation—and the DTO's efforts to deal with the problem. Ms. Chavez described giving money to another co-conspirator and yet another co-conspirator's need to move to a new apartment in order to keep drugs and money separate. Rivas-Estrada gave her instructions for how his brother—an

indicted co-conspirator—could coordinate the move.  Both calls served to keep Rivas-Estrada up to date with drug-trafficking and money laundering operations, and thus furthered the conspiracy.[3]

Nor did the recordings serve as improper character evidence.  The Government did not emphasize the family circumstances that concern Rivas-Estrada, nor did it emphasize the parts of the calls discussing family matters.  Instead, it focused on the parts of the conversations pertinent to the conspiracy.  The district court did not err in admitting the recordings.[4]  We affirm Rivas-Estrada's conviction.

### III.

We next turn to Torres-Lopez.  She argues the Government failed to prove her knowledge of the money laundering conspiracies.  She preserved her sufficiency challenge below, so we review *de novo*.  *United States v. Girod*, 646 F.3d 304, 313 (5th Cir. 2011).  We must affirm "if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt." *Ibid.* (quotation omitted).  We affirm.

To prove a conspiracy to commit money laundering, the Government must show "(1) that there was an agreement between two or more persons to commit money laundering and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose." *United States v. Cessa*, 785 F.3d 165, 173 (5th Cir. 2015).  Here, the Government alleged "concealment money laundering," which requires it to show a

---

[3] Rivas-Estrada also contends many hearsay statements were not properly admitted because the district court did not expressly find that each declarant was Rivas-Estrada's co-conspirator (the second element).  He does not point to any particular hearsay statements, however, so he forfeits this challenge.

[4] Rivas-Estrada does not indicate in his briefing that he raised an improper character evidence or Rule 403 objection in the district court, and we will not search the record for such an objection.  *See Scroggins*, 599 F.3d at 447.  The district court did not err under either plain error or abuse of discretion review.

No. 17-40124

conspiracy to "conduct a financial transaction with proceeds of a specified illegal activity . . . with the knowledge that the transaction's design was to conceal or disguise the source of the proceeds." *Id.* at 173–74.

Torres-Lopez does not dispute that the DTOs were engaged in concealment money laundering; she attacks only the knowledge element of the money laundering conspiracy. She argues "the record is devoid of evidence suggesting that [she] knew" the money came from "drug distribution." Because the jury acquitted her of the drug-conspiracy charge, Torres-Lopez says, it must have found she was not involved in drug trafficking. And if she was not involved in drug trafficking, she could not have known she was laundering proceeds of drug trafficking. And she could not have known the transactions were designed to conceal the nature or source of the proceeds, she explains, "because she had no idea what that nature or source actually was."

Conspiracy to commit money laundering does not require that the defendant know exactly what "unlawful activity" generated the proceeds. 18 U.S.C. § 1956(a)(1), (h). Rather, the knowledge element is satisfied where the defendant acts with "knowledge that the transaction involves profits of unlawful activity." *Cessa*, 785 F.3d at 174. So Torres-Lopez's acquittal of the drug-conspiracy charge is immaterial.

There was sufficient evidence to convict Torres-Lopez. People engaged in legitimate transactions generally do not carry shoe boxes containing up to $40,000 in cash, ask money services businesses to help fabricate sender names, structure transactions to avoid reporting, and send those structured wires to the same recipients in a methamphetamine hot spot day after day. Nor do they usually expect a money services business to turn off its security cameras. Torres-Lopez did not have to be involved in drug trafficking herself to know that transactions riddled with red flags involved proceeds of unlawful activity. And the very nature of her actions—structuring wires to recipients in

No. 17-40124

Michoacán using falsified names and without security cameras rolling—was designed to promote the underlying unlawful activity even if she did not know exactly what that was.

In any event, the jury was given a deliberate-ignorance instruction. So, the Government could establish knowledge by showing "the Defendant deliberately blinded . . . herself to the existence of a fact."[5] The evidence supports an inference Torrez-Lopez was, at the very least, deliberately blind to the fact that the DTOs were laundering the proceeds of some illegal activity and that her cooperation promoted that object. We affirm her conviction.

IV.

Finally, we address Centeno-Herrera. Like Torres-Lopez, Centeno-Herrera challenges the sufficiency of the evidence to support her conviction for conspiracy to commit money laundering. She also contends the district court abused its discretion by not allowing her to put on evidence she was being treated for cancer.

A.

We review the sufficiency of the evidence *de novo*. The conviction must be affirmed unless no reasonable factfinder could find all elements of the offense beyond a reasonable doubt. *See Girod*, 646 F.3d at 313. Like Torres-Lopez, Centeno-Herrera argues the evidence was insufficient to show she knew she was wiring illegal drug proceeds. Because she didn't understand "that she was transferring money for a drug trafficking organization," she says, she could not have conspired to conceal its illegal proceeds.

---

[5] Torres-Lopez does not challenge the propriety of this instruction. A deliberate ignorance instruction is appropriate whenever the evidence (viewed in the light most favorable to the Government) "supports inferences that (1) the defendant was subjectively aware of a high probability of the existence of illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." *United States v. Freeman*, 434 F.3d 369, 378 (5th Cir. 2005) (quotation omitted). That standard was met here.

We reject this sufficiency argument for the same reasons we reject Torres-Lopez's. The Government showed that Centeno-Herrera helped the money couriers come up with fake names and structure their wires. One money courier testified that Centeno-Herrera would handle everything herself and call him with a code phrase when the wires were complete. And the Government showed there were myriad red flags, such as cash carried into Centeno-Herrera's store in thousands-of-dollar increments and wires that were both structured to avoid reporting and destined for Michoacán. Centeno-Herrera had been trained to identify these red flags. At the very least, she was willfully blind to the unlawful nature of her conduct.

Perhaps most tellingly, Centeno-Herrera did not put a stop to the suspicious transactions even when federal agents informed her money laundering was taking place at her business. Her sufficiency-of-the-evidence challenge therefore fails.

### B.

During the conspiracy period, Centeno-Herrera was treated for cancer. Before trial, the district court granted the Government's motion in limine to exclude "[t]he health condition of any trial defendant" based on a lack of relevance. But at the start of trial, Centeno-Herrera asked the court for permission "to bring in her medical condition . . . because it goes to her state of mind and her ability to be able to focus on what was going on around her." The district court reviewed Centeno-Herrera's medical records and concluded there was no evidence Centeno-Herrera's mental state was impaired by her illness or treatments. So the court found the evidence not relevant and offered only to gain the jurors' sympathy. The district court suggested it might reconsider the issue if Centeno-Herrera testified. But she did not press the issue again when she took the stand.

No. 17-40124

We review the district court's evidentiary ruling for abuse of discretion. *See Joiner*, 522 U.S. at 141. We find none. The proffered evidence does not show Centeno-Herrera was mentally impaired by cancer or her treatments. She testified the treatment compromised her immune system, but she did not describe any mental effects. The district court did not abuse its discretion in concluding the evidence lacked any tendency to make it "more or less probable" that Centeno-Herrera acted with a culpable mental state. FED. R. EVID. 401.

On appeal, Centeno-Herrera proffers another reason this evidence would have been relevant: To show she was absent from the stores much of the time, so she could not have known about the suspicious transactions. She did not present this theory of admissibility to the District Court, so we review it for plain error. *See United States v. Andaverde-Tiñoco*, 741 F.3d 509, 516 (5th Cir. 2013); *United States v. Arviso-Mata*, 442 F.3d 382, 384 (5th Cir. 2006). Reversal for plain error requires the appellant to make a fourfold showing:

> First, there must be an error or defect. . . . Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it "affected the outcome of the district court proceedings." Fourth and finally, if the above three prongs are satisfied, the court of appeals has the discretion to remedy the error—discretion which ought to be exercised only if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

*United States v. Delgado*, 672 F.3d 320, 329 (5th Cir. 2012) (en banc) (alteration in original) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

Centeno-Herrera cannot satisfy any of these. She was able to tell the jury she was frequently absent from her money services businesses and relied on her daughter to run them.[6] She just didn't tell the jury the reason for these

---

[6] Centeno-Herrera testified she "didn't really know anything about [the business]" and relied on her daughter's help to run it. She took the stand and told the jury she "was never

absences.    If Centeno-Herrera thought her cancer treatments would give greater heft to her alleged alibi, she could have so argued to the district court. Even now, however, Centeno-Herrera does not claim the timing of any particular treatment precluded her from being present for any particular money laundering transaction.  Without such a connection, it is hard to see how this evidence would have added anything to her defensive theory.  We find no plain error in the exclusion of evidence that Centeno-Herrera was treated for cancer during the conspiracy period.

Citing *Rock v. Arkansas*, 483 U.S. 44 (1987), Centeno-Herrera contends exclusion of her cancer and treatment "interfer[ed] with the presentation of [her] defense in violation of the Due Process Clause of the Fifth Amendment." She did not raise this constitutional challenge below, so we ask, once again, whether the district court plainly erred.  *See United States v. Miranda*, 248 F.3d 434, 443 (5th Cir. 2001).

Again, the district court did not plainly err.  A criminal defendant's constitutional right to present a defense covers "relevant testimony."  *Rock*, 483 U.S. at 55; *see also United States v. Scheffer*, 523 U.S. 303, 308 (1998); *cf. United States v. Valenzuela-Bernal*, 458 U.S. 858, 867–72 (1982). "[C]riminal defendants do not have a [due process] right to present evidence that the district court, in its discretion, deems irrelevant or immaterial." *United States v. Malloy*, 568 F.3d 166, 177 (4th Cir. 2009) (quotation omitted); *accord United States v. Humphrey*, 608 F.3d 955, 962 n.3 (6th Cir. 2010); *United States v. Solomon*, 399 F.3d 1231, 1239 (10th Cir. 2005); *United States v. Munoz*, 233 F.3d 1117, 1134 (9th Cir. 2000), *superseded by statute on other grounds.* "[T]he trial judge's role as gatekeeper is to ensure that the factfinder

---

working there.  I was not there.  The only one that was working at the store was Luvy."  And she told the jury that "[d]ue to reasons that were not of my own will, I was not able to ever be there."

bases its decision only on relevant and reliable information." *United States v. Mitrovic*, 890 F.3d 1217, 1222 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 267 (2018). The district court did not abuse its discretion. Thus Centeno-Herrera's due process rights are not implicated.[7]

\* \* \*

The judgment of the district court is AFFIRMED.

---

[7] Even if the district court had erred, we doubt a garden-variety evidentiary error found to be harmless would implicate Centeno-Herrera's constitutional rights. We have suggested an evidentiary error does not give rise to a due process deficiency so long as the defendant was afforded a "fair trial, hence, due process." *Trussell v. Estelle*, 699 F.2d 256, 262 (5th Cir. 1983); *cf. Clack v. Reid*, 441 F.2d 801, 804 (5th Cir. 1971) (suggesting the state trial judge may have abused its discretion in barring certain cross examination by the defendant, but nevertheless concluding any error did not "rise to federal constitutional status"). The constitutional right to a fair trial is satisfied where any error could not have affected the verdict.